400 So.2d 443 (1981)
Samuel S. SMITH, Appellant,
v.
Lew BRANTLEY, President, the Florida Senate; Joe Brown, Secretary of the Florida Senate; Reubin O'd Askew, Governor, and Robert L. Shevin, Attorney General, Appellees.
No. 54549.
Supreme Court of Florida.
June 18, 1981.
*444 Joseph C. Jacobs and J. Lawrence Johnston of Ervin, Varn, Jacobs, Odom & Kitchen, Tallahassee, for appellant.
D. Stephen Kahn, Tallahassee, Edward M. Chew, Tampa, and Jim Smith, Atty. *445 Gen., and Martin S. Friedman, Asst. Atty. Gen., Tallahassee, for appellees.
PER CURIAM.
Pursuant to article V, section 3(b)(1) of the Florida Constitution (1972), Samuel Smith appeals a final declaratory judgment of the Circuit Court of Leon County. The circuit court construed article X, section 3 of the Florida Constitution to require acceptance of a resignation by the governor in order to create a vacancy in office, and declared that a resignation does not occur until it has been accepted. In relevant part, article X, section 3 provides that "[v]acancy in office shall occur upon... resignation... ."
We hold that a public officer's resignation, stated to be effective immediately, is effective upon submission to the proper authority and that the governor's acceptance is not necessary in order to create a vacancy in office.
The judgment brought to us in this case also finds that The Florida Senate had subject matter jurisdiction to try Samuel Smith for impeachable offenses and that his impeachment conviction was in all respects valid. We hold that The Florida Senate has no jurisdiction to impeach a former officeholder who had effectively relinquished his office prior to the commencement of impeachment proceedings. The determination of the trial court with respect to the validity of Smith's impeachment conviction, however is affirmed.

I
As a preliminary matter, we note Smith's contention that section 121.091(5)(g), Florida Statutes (1977) (forfeiture of retirement benefits upon impeachment), is unconstitutional. This issue was raised for the first time in this appeal. Smith did not challenge the constitutionality of this statute in his complaint for declaratory relief. He did initially join the secretary of the Department of Administration and the state retirement director as parties defendant to his declaratory suit. They were dismissed by the trial court, however, based on their assertions (1) that the complaint presented no justiciable controversy with respect to them because there had not been final agency action, (2) that it was uncertain whether final agency action concerning Smith's application would be unfavorable, and (3) that it was uncertain whether the final result of impeachment proceedings would be unfavorable to Smith. Smith does not challenge the trial court's dismissal order.
Since the trial court did not pass on the constitutionality of section 121.091(5)(g) and dismissed all parties before him relevant to that issue, this issue is not properly before us for review. See Century Village, Inc. v. Wellington, E, F, K, L, H, J, M, & G, Condominium Association, 361 So.2d 128 (Fla. 1978); South Dade Farms, Inc. v. Peters, 107 So.2d 30 (Fla. 1958).

II
To understand the matters that are properly before us, we must set out the following undisputed facts.
Samuel Smith became a circuit judge in 1961. He voluntarily suspended himself from the bench in 1977, and was later that year suspended by this Court. In re Inquiry Concerning a Judge, 347 So.2d 1024 (Fla. 1977). See also Williams v. Smith, 360 So.2d 417 (Fla. 1978). By letter dated January 13, 1978, he attempted to resign his office as circuit judge, effective immediately. Thereafter, by letter dated January 17, 1978, the governor refused to accept the resignation, stating: "I do not accept your resignation due to the nature of the pending criminal cases and the fact that any executive action at this time might preclude the appropriate State response to the outcome of these proceedings."
On January 31, 1978, the Speaker of the Florida House of Representatives appointed a special committee to consider the impeachment of Smith. On April 12, 1978, the House of Representatives voted articles of impeachment against Smith. On April 17, he filed this lawsuit, requesting that the *446 trial court declare that he had effectively resigned his office in January and was no longer an officer subject to impeachment or, in the alternative, that he was no longer subject to impeachment because he had been removed from office upon conviction of criminal charges in federal court or had retired. He also asked the trial court to declare the impeachment proceeding a nullity.
In May 1978, The Florida Senate convened as a court of impeachment to try Smith, pursuant to article III, section 17(c), Florida Constitution (1972). On May 26, 1978, then Chief Justice Overton, acting as presiding officer for the proceeding, advised the Senate that it had jurisdiction to try Smith, irrespective of whether the governor accepted or rejected his resignation. Fla.S. Jour. 41, 42 (Court of Impeachment 1978). Shortly thereafter, the trial court considering Smith's lawsuit denied Smith's motion to declare the impeachment trial a nullity.
On September 15, 1978, the Senate convicted Smith of impeachable offenses, removing him from office and, by additional vote, disqualifying him from future officeholding under article III, section 17(c). Fla. S.Jour. 192 (Court of Impeachment 1978).

III
The requirement of gubernatorial acceptance for an effective resignation, as a means of creating a vacancy in office, was considered carefully by the trial court in Smith's lawsuit. Relying on State ex rel. Gibbs v. Lunsford, 141 Fla. 12, 192 So. 485 (1939), the trial judge ruled that acceptance by the governor is required before a resignation becomes valid to create a vacancy in the office. In Lunsford, Constable Wallace Caswell was suspended in August 1937, and tendered his resignation, effective immediately, to the governor on November 7, 1938. On November 8, 1938, a general election was held, and one Grice was elected constable for the remainder of Caswell's term. On November 9, 1938, the governor accepted Caswell's resignation. The Court held that the resignation did not become effective until the governor accepted it, saying:
A decision in the case at bar turns on the question of the effective date of the resignation, supra. If the resignation is effective on November 7, 1938, as contended by the respondent Grice, then there was a vacancy in the office of Constable lawfully balloted upon by the voters of the District at the General Election held on November 8, 1938 and the voters thereof as shown by the record declared their preference by giving Grice 81 votes as against 9 for Lunsford, and respondent Grice should be declared the lawful occupant thereof. On the other hand, if the effective date of the resignation, supra, is November 9, 1938, then the office was held by Wallace Caswell on November 8, 1938, the date of the General Election, and no vacancy then existed and the voters of the District were without lawful authority to write on the ballots the names of Grice and Lunsford, because there was not at the time thereof a vacancy in the office of Constable for said district.
... .
The vacancy occurred when the resignation became effective. The resignation became effective (regardless of the contrary statement in the resignation) when it was accepted by the Governor.
141 Fla. at 16-17, 22, 192 So. at 487, 489. Justice Brown dissented on the grounds that, since Caswell had been suspended, the major rationale for requiring acceptance no longer existed. That rationale was that an official could not shirk his official duty and responsibilities merely by resigning.
Inexplicably, the Lunsford opinion did not mention State ex rel. Landis v. Heaton, 132 Fla. 443, 180 So. 766 (1938), which had reached precisely the opposite conclusion on the matter of acceptance. In Heaton, the attorney general brought an action in quo warranto challenging Heaton's and Britton's status as members of the Florida Industrial Commission and contesting the validity of their appointments to that commission. Britton answered that he had resigned by tendering his resignation to the governor. The attorney general replied *447 that Britton's resignation was ineffective because it was not accepted. The Court disagreed:
The fact is that he has exercised the right to resign and, having resigned in due and lawful form and abandoned the office, the office is vacant... .
When Britton resigned and abandoned the office, he did all that he could do, and all that he is required to do, to divest himself of his official character.
132 Fla. at 447, 180 So. at 768.
Both Lunsford and Heaton were decided under the Florida Constitution of 1885. The Lunsford decision noted that "[t]here is no constitutional or statutory provision in Florida fixing the effective date of a resignation, but Section 14 of Article 16 of the Constitution of Florida [1885] provides: `All State, County and Municipal officers shall continue in office after the expiration of their official terms until their successors are duly qualified.'" 141 Fla. at 17, 192 So. at 487.
Florida's Constitution still does not define or fix the effective date of a resignation, and the provision for continuance in office has now been removed. The present Constitution, moreover, expressly refers to resignation as a means of creating a vacancy; a provision which had no counterpart in prior constitutions. Art. X, § 3, Fla. Const.
By statute, resignation had long been declared a means of creating a vacancy in office. See, e.g., Ch. 1633, § 1, Laws of Fla. (1868); Ch. II, art. III, § 461, Comp. Gen. Laws Ann. (1927); § 114.01(2), Fla. Stat. (1975) ("Every office shall be deemed vacant ... [b]y [the incumbent's] resignation."). In 1977, the legislature amended the vacancy-by-resignation statute to state that a vacancy occurs only after the resignation has been accepted by the governor. Ch. 77-235, section 1, Laws of Florida, appearing as section 114.01(1)(d), Florida Statutes (1977). This statute, which became effective June 15, 1977, was in force when Smith's resignation was tendered.
Smith's principal argument here is that the new statute requiring gubernatorial acceptance impermissibly places a new condition precedent upon a constitutionally defined event. We agree in large part with this contention.
Whether a public official may unilaterally resign his position is a question which has not only confounded this Court but has divided the authorities nationally. The opposing views may be traced to the difference between the English common law and American concepts of public office. Under English common law, a person elected to public office was obliged to accept it as a burden to bear for the good of the community. In some instances, refusal to serve was a punishable offense. Similarly, the officeholder could not discard his duties at will, and needed the consent of the proper authorities. M. Throop, Public Officers § 409 (1892); F. Mechem, Public Offices and Officers § 414 (1890).
But that was not the view which emerged in this country. The idea that a civil officer in the United States could be compelled against his will to hold office or be liable for refusing to do so "is not in accord with prevailing American ideas of liberty of action." State ex rel. Ryan v. Murphy, 30 Nev. 409, 424, 97 P. 391, 394 (1908). An early expression of this view is found in United States v. Wright, 28 Fed.Cas. p. 792 (C.C.D. Ohio 1839) (No. 16775), where the issue was whether Wright was liable as surety for acts committed by Fogg, a collector of internal revenue, after Fogg had sent his resignation to the president but before it was accepted. In holding the resignation was complete when received, the court said: "[T]here can be no doubt that a civil officer has a right to resign his office at pleasure, and it is not in the power of the executive to compel him to remain in office." Id. at 793.
Appellees argue for a required acceptance of a resignation, directing our attention to Edwards v. United States, 103 U.S. 471, 26 L.Ed. 314 (1880), as authority for application of the English common law rule. Edwards, the town supervisor, tendered his resignation to the township board and then refused to levy certain taxes for payment of a judgment entered against the town prior *448 to his letter of resignation. The board took no action on his resignation, and the issue before the Court was whether the resignation was effective, thus leaving Edwards without authority to levy the tax. The Court acknowledged that our country's different approach to the concept of public office led some states to discard or modify the acceptance requirement. However, Michigan, the place where the action arose in Edwards, still followed the English common law rule. Thus, Edwards' unaccepted resignation was found not to be effective, and a peremptory writ of mandamus was allowed to stand.
The Edwards court expressed concern with extending the "right to resign" rule announced in Wright to elected officials "whose services are absolutely necessary to carry on local government... ." 103 U.S. at 477 (quoting State ex rel. Reeves v. Ferguson, 31 N.J.L. 107, 123 (1864)). The policy underlying this limitation was twofold: first, public convenience must not suffer from a vacancy in public office; and second, an official may not evade a duty to creditors by resigning his position. People ex rel. McCarthy v. Barrett, 365 Ill. 73, 5 N.E.2d 453 (1936).
In our view, the Edwards decision does not compel the result for which appellees argue. Rather, it leaves the states free to choose. We believe that where adequate safeguards exist to protect the public and the rights of creditors, there is absolutely no reason to qualify or limit an official's right to relinquish public office. More importantly, we believe this "American view" undergirds the "resignation" method of creating an office vacancy which was placed in article X, section 3 of our constitution.
When Smith tendered his resignation on January 13, 1978, he had already been suspended without pay by this Court on recommendation of the Judicial Qualifications Commission. See In re Inquiry Concerning a Judge, 347 So.2d 1024 (Fla. 1977); See also art. V, § 12(d), Fla. Const. (1972). Obviously, no rights of creditors were affected by his relinquishment of office. Equally obvious is the fact that any public harm or inconvenience which might flow from the lack of a circuit judge in the third judicial circuit would have occurred at the time of suspension in 1977, and not as a result of Smith's resignation in 1978.
In all events, however, the Florida Constitution provides a mechanism to eliminate any possible public harm or inconvenience upon the creation of a vacancy in judicial office, even in a resignation situation. The chief justice of this Court is granted the power to assign active and consenting retired judges to temporary duty in any court for which the judge is qualified. Art. V, § 2(b), Fla. Const. (1972). Since the public could not be inconvenienced by a vacancy in the office of circuit judge, no constitutional reason would exist to restrict Smith's right to resign unconditionally, without executive approval.
Parenthetically, we note that we are not aided by this Court's decision in Spector v. Glisson, 305 So.2d 777 (Fla. 1974), on which Smith would rely for constitutional gloss. That decision held only that an effective resignation creates a present vacancy to be filled by election. There, an incumbent justice's resignation, effective prospectively, was held to have created a present vacancy in office which could be filled by an election while the resigning justice still held office. Any issue involving acceptance was never reached because "the Governor ... decided to and did accept the resignation." Id. at 780. Although the quoted sentence ends "which may not have been controlling in any event," that language  whatever it may mean  was unnecessary to the issue in the case and is unavailing as precedent.
The American view of the Constitution requires that we examine the 1977 statute purporting to place an acceptance limitation on all resignations. § 114.01(1)(d), Fla. Stat. (1977). We know, of course, that a statute may adopt one of several possible meanings attributable to a constitutional provision and that, where appropriate, such legislative constructions are to be given great weight in interpreting the provision. Greater Loretta Improvement *449 Association v. State ex rel. Boone, 234 So.2d 665 (Fla. 1970). Regrettably, that rule of construction does not appear pertinent here, for the legislature apparently adopted neither of the conflicting decisional precedents in Florida which had construed the word "resignation." Rather, the statute was purportedly amended simply "to comport [with] the language in ... Art. X, § 3, Fla. Const... . ." Staff Report to Committee Substitute for S.B. 53 (Feb. 9, 1977). That language, as we have noted, as much as anything else, adopts the American view of resignation which earlier statutes had expressed; namely, that only some extraordinary vacancies by resignation require an acceptance.
Finally, we note Smith's claim that the statute is an unlawful delegation of legislative power to the governor, in that it lacks sufficient standards to guide the exercise of the delegated authority. If we were to construe article X, section 3, to require acceptance, that suggestion would have to be considered. That constitutional problem dissipates, however, since we have limited the need for an acceptance to situations in which governmental duties will not be performed or the rights of creditors will be adversely affected, neither of which pertains here.
In sum, we hold that article X, section 3, adopts the "American view" of resignations and that the acceptance requirement of section 114.01(1)(d), Florida Statutes (1977), pertains only to those rare, dire situations contemplated by Edwards v. United States, where the public weal is affected adversely by the absence of an officeholder.

IV
Having concluded that Smith's resignation could be effective without acceptance by the governor under the constitution, we are faced with the knotty question of whether his conviction of impeachable offenses by The Florida Senate is valid. This issue implicates the ability of the legislative branch to initiate impeachment proceedings against persons not holding an enumerated public office.
The undisputed facts in this proceeding, which we have recited earlier, indicate that Smith's resignation clearly was tendered well before initial steps were taken to launch impeachment proceedings in the Florida House of Representatives. The threshold question which these facts pose is whether one need be in office for impeachment proceedings to be validly initiated; that is, whether the subject matter jurisdiction of the legislative branch depends upon a person being an "officer" under the constitution when the proceedings are commenced. The issue of subject matter jurisdiction for impeachment is properly determined by the judiciary, of course. In re Executive Communication, 14 Fla. 289 (1872). Our conclusion on this question is that one must be such an officer to be impeachable.
Article III, section 17 of the Florida Constitution prescribes the nature and method of impeachment. Subsection (a) initially provides which public officials "shall be liable to impeachment for misdemeanor in office." Throughout the balance of section 17, the word "officer" is used, apparently, as a shorthand expression for the persons specifically enumerated in subsection (a) as subject to impeachment.
Analysis of the language of the constitution in its present form convinces us that one remains an officer subject to impeachment under section 17 only so long as he occupies a public position. Subsection (b) of section 17 provides that an officer "shall be disqualified from performing any official duties" once he is impeached by the House of Representatives. It obviously contemplates a person who has official duties to perform. Indeed, subsection (b) in its entirety has no utility unless the term "officer" means a person who performs official, public duties. Similarly, subsection (c) states that a judgment of conviction "shall remove the offender from office."
From the structure of subsections 17(b) and (c) of article III, it can be fairly concluded that the primary and dominant purpose *450 of impeachment in Florida is removal of an officeholder from office. This purpose, of course, is accomplished when an official effectively resigns and thus ceases to be an "officer" subject to impeachment. In fact, it has been suggested that "[u]nder proper circumstances, resignation is a fitting and foreseeable conclusion to impeachment, a coherent part of the process." Firmage & Mangrum, Removal of the President: Resignation and the Procedural Law of Impeachment, 1974 Duke L.J. 1023, 1089.
This conclusion is not derogated by the fact that impeachment may also serve to disqualify an official from future officeholding  a purpose which might be undermined if officials could escape impeachment by resignation. The language of subsection 17(c) on this point however, merely reinforces the notion that this role of impeachment is merely secondary to removal from office.
Subsection (c) states that conviction in an impeachment proceeding entails removal from office "and, in the discretion of the senate, may include disqualification to hold any office of honor, trust or profit." Disqualification from future officeholding is not, like removal, an automatic consequence of impeachment. Rather, it is a further punishment which may or may not be imposed once the original purpose of the impeachment proceeding is fulfilled. The significance of this arrangement is highlighted by the history of this impeachment provision. Before 1968, both removal and disqualification were automatic upon conviction in an impeachment case. Art. III, § 29, Fla. Const. (1885). The Legislative Committee of the 1968 Constitutional Revision Commission drafted the present provision, not only making disqualification discretionary but simultaneously reposing all power over future disqualification in the non-initiating chamber  the Senate. It follows, we think, that impeachment under article III, section 17 of the Florida Constitution is not available simply to disqualify a person from future officeholding, and that therefore one who has been but is no longer an enumerated public official, being non-removable, is not subject to impeachment.
There is, of course, no evidence in this proceeding that either the Florida House of Representatives or The Florida Senate endeavored to impeach Smith simply to disqualify him from future officeholding. Indeed, the contrary appears, for promptly after the House voted articles of impeachment, and well before the Senate convened to consider the matter, Smith's attorney advised the president of the Senate that his client would waive forever his right to hold or seek public office. The Senate proceeded nonetheless, but only after being advised that Smith was still an "officer" because his resignation had not been accepted.
Several authorities are cited by counsel to suggest that public officials historically have not been permitted to avoid the consequences of impeachment by resigning from office. Our research indicates, however, that every one of those precedents involves a resignation which occurred after the legislative branch had exercised initial jurisdiction over the offending public officeholder, so that he was in fact an officer when subject matter jurisdiction attached.
Secretary of War William Belknap was impeached by the United States House of Representatives and tried by the Senate after he had resigned, but his resignation followed the commencement of proceedings in the House. 4 Cong.Rec. 343-54, 1426-33 (1876). United States Senator William Blount resigned after he was impeached by the House, and before the Senate subsequently tried him. 2 Annals of Cong. 2244-2415 (1798). Texas Governor James Ferguson was impeached by the Texas Senate, but his resignation was submitted after the House had preferred articles of impeachment and after the Senate had launched its trial. Ferguson v. Maddox, 114 Tex. 85, 263 S.W. 888 (1924).
These precedents do not suggest, of course, that a senate trial must be held after a valid resignation. The United States Senate decided not to proceed against United States District Judge George English after his resignation, even though the House of Representatives had *451 preferred articles of impeachment. 68 Cong.Rec. 297-302 (1926). The Florida Senate terminated its proceeding on articles of impeachment against Insurance Commissioner Thomas D. O'Malley upon his resignation. Fla.S.Jour. 15-16 (Org.Sess.  Court of Impeachment 1975). The Florida Senate likewise declined to proceed after it had received the resignation of Circuit Judge James Magbee. Fla.S.Jour. 55-57 (Reg.Sess. 1871).
We have not been directed to any authority, in Florida or elsewhere, which states that, notwithstanding a resignation before House proceedings, the legislature has subject matter jurisdiction to impeach the resigned official. Given our constitution's removal-oriented theme and a complete absence of judicial authority approving impeachment of a non-officer, we reject any suggestion that a former officeholder is impeachable. We are not called upon here to determine the point at which legislative impeachment proceedings are commenced, and we decline to do so. Nor are we called upon to declare whether or under what circumstances an effective resignation in the course of a duly commenced impeachment proceeding will act to terminate or suspend those proceedings, if any. We hold, simply, based on the precise language of article III, section 17 of the Florida constitution, that impeachment proceedings in Florida may not be commenced against a former officeholder who has effectively relinquished his public office by resignation. Any endeavor to launch such a proceeding against a non-officeholder is ineffective and void, based on the legislature's lack of subject matter jurisdiction over the individual involved.

V
For the reasons expressed above, we reverse the judgment of the trial court insofar as it construes article X, section 3 of the Florida Constitution to require, in all cases, the governor's acceptance of a public officeholder's resignation in order to create a vacancy in office. Further, we construe article III, section 17(a) of the Florida Constitution to mean that the legislative branch has no jurisdiction to initiate impeachment proceedings against a person who is not at that time holding one of the enumerated public offices.
Nonetheless, for the reasons separately expressed by a majority of the justices below, we hold that the Florida Senate had jurisdiction to try Smith for impeachable offenses, and that his conviction served to remove him from office and, by separate vote, to disqualify him from holding any office of honor or trust or profit in the State of Florida.
It is so ordered.
SUNDBERG, C.J., and ADKINS, J., concur in part and dissent in part with an opinion.
BOYD, J., concurs in part and dissents in part with an opinion.
ENGLAND, J., concurs in part and dissents in part with an opinion.
ALDERMAN, J., concurs in part and dissents in part with an opinion in which McDONALD, J., and TILLMAN PEARSON (Ret.), Associate Justice, join.
OVERTON, J., recused himself and did not participate in this decision because, while presiding as Chief Justice in appellant's impeachment proceeding, he rendered an advisory opinion on an issue in this case to the Florida Senate.
SUNDBERG, Chief Justice and ADKINS, Justice, concurring in part and dissenting in part.
We fully concur in parts III and IV of the opinion of the Court. It follows from that analysis, and from the fact that House proceedings were commenced against Smith only after his unconditional resignation was tendered to the appropriate governmental official, that Samuel Smith's impeachment by The Florida Senate was a nullity. The order of the trial court to the contrary should be reversed.
*452 BOYD, Justice, concurring in part and dissenting in part.
I concur in the result announced in part III of the opinion of the Court, that appellant's resignation was effective when submitted and that he therefore ceased to be a circuit judge at that time. I reach this conclusion by a much shorter route than that detailed in the opinion of the Court. Under article X, section 3, Florida Constitution, a vacancy in office is created by the resignation of the officer. Thus the constitution adopts the "American rule" on the question of whether a resignation must be accepted to be effective.
The opinion in United States v. Wright, 28 Fed.Cas. p. 792 (C.C.D. Ohio 1839) (No. 16775), cited in the opinion of the Court, articulated the "American rule." "[A] civil officer has a right to resign his office at pleasure, and it is not in the power of the executive to compel him to remain in office." Id. at 793. In Edwards v. United States, 103 U.S. 471, 26 L.Ed. 314 (1880), as the opinion of the Court points out, the "English rule" was applied because of concern over extending the free right to resign to officials whose services were necessary to the continued operation of local government. By holding that Florida's constitutional adoption of the "American rule" will be honored except in "those rare, dire situations ... where the public weal is affected adversely by the absence of an officeholder," opinion of the Court at 449, the Court today actually adopts a hybrid American-English rule. And, despite extended discussion of the problem, the Court offers no enlightenment about what circumstances will prompt it in the future to apply the "public necessity" or "English" rule. Thus there is uncertainty in the law about when resignations will be effective. Questions will arise concerning the binding effect of actions taken by officers who have tendered resignations but which have not been accepted. I would declare that all unconditional resignations are effective when submitted.
I also concur with part IV of the opinion of the Court, holding that under article III, section 17(a), Florida Constitution, the legislature had no power to commence impeachment proceedings against appellant, since he was not an "officer" within the meaning of the word as used in that provision. I would state this conclusion somewhat differently, however. Rather than saying that "it can be fairly concluded that the primary and dominant purpose of impeachment in Florida is removal of an officeholder," opinion of the Court at 449, I would say that such is the only fair conclusion. That the constitution gives the Senate discretion to impose an additional penalty on one convicted in an impeachment trial does not weaken my belief on this point. The clear language of section 17(a) controls: "The house of representatives by two-thirds vote shall have the power to impeach an officer." Appellant was not an officer and therefore could not be impeached. I reach this conclusion in much shorter order than does the opinion of the Court.
For these reasons I agree with the conclusion reached by Chief Justice Sundberg and Justice Adkins that the impeachment proceeding was a nullity and the judgment of the court below must be reversed. I disagree with the conclusion reached by Justice England that the holding of the Court should be given prospective effect only. Justice England points out that prospective-only application of a decision is appropriate when retrospective application would impose hardship on persons who reasonably relied upon a clear state of the law, and whose expectations would be unfairly upset by application to them of a new rule of law. The opinion of the Court, however, does not overrule any precedents or announce any new principles of law. The existing precedents on the question of whether resignation is effective without acceptance were very few and were in conflict. Furthermore, the question had been resolved by the adoption of a new constitutional provision that directly controlled. Art. X, § 3, Fla. Const. (1968). ("Vacancy in office shall occur upon ... resignation... .")
*453 As I read the opinion of the Court, its holdings on the issues of when a resignation is effective and on what persons are subject to being impeached are based upon a plain reading of the constitution as revised in 1968. The advice given in good faith to the governor and legislature in connection with this impeachment proceeding was not based on any firm, coherent pronouncements of Florida courts construing the 1968 constitution. By Justice England's joining with the others voting to affirm, it is ensured that Smith, and Smith alone, will suffer the burdens of impeachment based upon a proceeding which the majority today holds cannot in the future be conducted against one similarly situated. The result of today's decision therefore denies Smith equal protection of the law under the United States and Florida Constitutions.
I dissent from the ultimate holding of the Court. I would reverse.
ENGLAND, Justice, concurring in part and dissenting in part.
I fully concur in parts III and IV of the opinion of the Court. It does not follow, necessarily, that Smith's impeachment by The Florida Senate is invalid.
We are constitutionally permitted, in the exercise of our judicial prerogative, to determine whether any newly announced rule of law should be applied retroactively, or on a prospective basis only so as not to be available to the person who has raised the issue. See Great Northern Railway Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932); Wainwright v. Stone, 414 U.S. 21, 94 S.Ct. 190, 38 L.Ed.2d 179 (1973).
In Sunburst the Supreme Court was asked whether, consistent with the federal constitution, a state court could overrule precedent and yet not apply the rule to the case under consideration. In holding that a state may indeed apply its decisions only prospectively, Mr. Justice Cardozo succinctly stated the doctrine.
A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law nonetheless for intermediate transactions... . The choice for any state may be determined by the juristic philosophy of the judges of her courts, their conceptions of law, its origin and nature.
Id., 287 U.S. at 364-65, 53 S.Ct. at 148-149.
This Court has exercised its Sunburst prerogative on numerous occasions. See, e.g., Deltona Corp. v. Bailey, 336 So.2d 1163 (Fla. 1976), amplifying Interlachen Lakes Estates, Inc. v. Snyder, 304 So.2d 433 (Fla. 1973) (prospective invalidation of tax statute, based on reliance and assumption of validity); State v. White, 194 So.2d 601 (Fla. 1967) (prospective validity of criminal statute based on previously declared state of law).
It is appropriate to consider an exclusively prospective application of our determination regarding public officials' resignations because of the contrary state of the law at the time the subject impeachment proceedings were commenced, see State v. White, and because there was substantial reliance on that state of the law preliminary to and throughout these proceedings, see Interlachen Lakes Estates, Inc. v. Snyder. These two factors have been regarded as the dominant touchstones for determining pure prospectivity  that is, non-application of a new rule in the announcing case. See, e.g., Traynor, Quo Vadis, Prospective Overruling: A Question of Judicial Responsibility, 28 Hastings L.J. 533 (1976).
A court usually will not overrule a precedent ... when the hardship caused by a retroactive change would not be offset by its benefits. The technique of prospective overruling enables courts to solve this dilemma by changing bad law without upsetting the reasonable expectations of those who relied on it.
Id. at 541-42.
As noted earlier, when impeachment proceedings were launched by the House, precedents from this Court with respect to the requirement of a gubernatorial acceptance *454 were in conflict. The first decision of this Court on the subject, Heaton, did not require that a resignation be accepted by the governor in order to be effective. Barely a year later, in Lunsford, the Court held that the governor must accept a resignation in order for it to be effective. In evaluating judicial precedents, it is generally assumed a later decision by the same court on the same issue impliedly overrules a prior decision. Asher v. Texas, 128 U.S. 129, 9 S.Ct. 1, 32 L.Ed. 268 (1888); 20 Am.Jur.2d Courts § 232 (1965). Consequently, it was reasonable after 1939 for interested persons to assume that Lunsford overruled Heaton, and that the governor's acceptance was required in order for a resignation to be effective.
In fact, numerous public officials had relied on Lunsford as the state of the law. The attorney general had in prior years opined that Lunsford required the governor's acceptance of a resignation. See, e.g., 1977 Op. Att'y Gen. Fla. 077-9 (Feb. 3, 1977); 1974 Op. Att'y Gen. Fla. 074-175 (June 20, 1974). The governor was advised and believed that an acceptance was essential to vacate Smith's judicial position. The Florida House of Representatives was advised and believed that Smith was an officeholder at the time impeachment proceedings were commenced. The chief justice of this Court, as presiding officer of the impeachment court, advised the Senate that it had the authority and subject matter jurisdiction to try Smith for impeachable offenses and thereby, if convicted, to remove him from office.
"Reliance plays its heaviest role ... where lawyers advise clients extensively in their planning on the basis of existing precedent." Traynor, supra at 543.
Indeed, Smith himself did not put the issue before the judiciary until after the House had voted articles of impeachment, and the trial judge made his determination that an acceptance was necessary only after the chief justice had expressed his view to the Senate.
In Ciravolo v. The Florida Bar, 361 So.2d 121 (Fla. 1978), we faced a situation very much like the one now before us, involving both contradictory precedents and attorney reliance. We there noted that the attorney's action in that case "was predicated on a justifiable interpretation of this court's strong language in [a prior court decision], and the court's imperfect handling of precedents... . This court supplied the material that misled." Id. at 124. We refused to subvert that justifiable reliance, although we prospectively rejected the applicability of the case law on which that reliance was founded.
As in Ciravolo, state officials here acted reasonably in reliance on an imprecise state of law which we created. I believe, therefore, the Senate's exercise of subject matter jurisdiction over Smith was proper, and that our pronouncement today overruling Lunsford, and holding that a resignation is effective without the governor's approval, should be applied prospectively, to future officeholders only.
I would hold that The Florida Senate had jurisdiction to try Smith for impeachable offenses, and that his conviction served to remove him from office and, by separate vote, to disqualify him from holding any office of honor or trust or profit in the State of Florida.
ALDERMAN, Justice, concurring in part, dissenting in part.
I concur with that part of the Court's opinion holding that a public officer's resignation, stated to be effective immediately, is effective upon submission to the proper authority and that acceptance, except in very special circumstances, is not necessary in order to create a vacancy in office.
I dissent, however, from that part of the Court's opinion holding that the Florida Senate has no jurisdiction to impeach a former officeholder who has effectively relinquished his office prior to the commencement of impeachment proceedings. This holding unduly limits the provision of article III, section 17(c), Florida Constitution, that "[j]udgment of conviction in cases of impeachment ... in the discretion of the senate, may include disqualification to hold *455 any office of honor, trust or profit." It is a fundamental rule of construction that courts should not construe a constitutional provision in such a manner as would render any portion thereof superfluous, meaningless, or inoperative. Burnsed v. Seaboard Coastline Railroad Co., 290 So.2d 13 (Fla. 1974). The constitution should be construed so that every clause and every part thereof has meaning. To say that the Senate's discretion to disqualify an officer from holding office in the future is extinguished upon resignation of the officer is to render this portion of article III, section 17(c) inoperative.
The constitutional and statutory consequences of a conviction for impeachable offenses are not limited to removal from office, and an officer subject to impeachment may not escape these additional consequences by simply resigning. The power to disqualify from future public service an officer who has violated his position of public trust and honor is constitutionally as important as the power to remove from public office. Thus, the jurisdiction of the House to impeach and the Senate to try and to convict and to decide whether the consequence of disqualification should be imposed may not be eliminated by the officer's resignation prior to commencement of impeachment proceedings. Despite a resignation prior to impeachment, the Senate has the jurisdiction to decide for the public's benefit whether an officer who has violated his oath of office and his duty as a citizen should again be permitted to be placed in a public position of trust or honor.[1]
The majority holding will allow officers who secretly commit serious breaches of the public trust, "misdemeanors in office," which amount to impeachable offenses and which clearly should disqualify those officers from holding any office of trust or honor, to escape impeachment and disqualification if they resign or if their terms of office expire before their misdeeds are discovered and impeachment proceedings are begun. This surely was not intended by the framers of our constitution when they gave the Senate the authority to disqualify from holding public office persons who have abused the public trust by committing impeachable offenses while they were public officers.
Our founding fathers contemplated that a person convicted of an impeachable offense be sentenced to "a perpetual ostracism from the esteem and confidence, and honours and emoluments of his country." The Federalist No. 65 (A. Hamilton), reprinted in 43 Great Books of the Western World 198, 199 (R. Hutchins ed. 1952). Impeachment is more than the mere process of removing a corrupt official from office. It is a vindication for society of injuries caused by corrupt public officials. Karl and Davis, Impeachment in Florida, 6 Fla.St.U.L.Rev. 2, 57 (1978).
Accordingly, I would hold that even though a public official has resigned prior to commencement of impeachment proceedings, the Senate has jurisdiction to try him and to convict him for impeachable offenses and that Smith, having been convicted of impeachable offenses and having been expressly disqualified, is forever barred from holding public office in Florida.
McDONALD, J., and TILLMAN PEARSON (Ret.), Associate Justice, concur.
NOTES
[1] By letter dated April 13, 1978, Smith's attorney advised the president of the Senate that his client would waive forever the right to hold or seek any public office. This proposed "waiver" should not affect our decision. Just as a public officer may not divest the legislature of its constitutionally granted impeachment jurisdiction by resignation, neither may that officer avoid impeachment by coupling his resignation with a promise to never again seek public office.