447 So.2d 299 (1984)
Fenton L. GILBERT, Appellant,
v.
Betty J. GILBERT, Appellee.
SOUTHEAST BANK, N.A., Formerly Known As Southeast Bank Trust Company, Appellant,
v.
Betty J. GILBERT, Appellee.
Nos. 83-501, 83-821.
District Court of Appeal of Florida, Second District.
January 27, 1984.
Rehearings Denied March 21, 1984.
*300 Larry Helm Spalding of Lewis & Spalding, Sarasota, for appellant Fenton L. Gilbert.
George R. McLain of Harnden, McLain, Spivey & Dart, Chartered, Sarasota, for appellant Southeast Bank.
Arthur D. Ginsburg of Ginsburg, Byrd, Jones & Dahlgaard, Sarasota, for appellee Betty J. Gilbert.
GRIMES, Acting Chief Judge.
Among other points, this appeal poses, for the first time in Florida, the question of whether the assets of a spendthrift trust may be garnished for arrearages in alimony.
In the judgment of dissolution, the court ordered the husband to pay permanent periodic alimony of $2,500 per month and lump sum alimony in the amount of $35,000 payable in six-month installments of $3,500. The court also required that he be responsible for reasonable and necessary medical expenses of the wife attributable to her multiple sclerosis and that he pay her attorney's fees of $24,750. The husband never paid the attorney's fees and later stopped paying alimony and the wife's medical expenses. The court entered a writ of ne exeat and held him in contempt, but these actions proved futile because he fled the jurisdiction. He is now thought to be living in England. The husband also removed his assets from the state, thereby thwarting the wife's efforts to collect the arrearages.
In her efforts to enforce the dissolution judgment, the wife sought to garnish the husband's interest in a trust established by Emily H. Gilbert for the benefit of various beneficiaries and administered by Southeast Bank as trustee. The trust contained the following paragraph:
5.2  Spendthrift Provision; the interest of each beneficiary in the income or principal of each trust hereunder shall be free from the control or interference of any creditor of a beneficiary or of any spouse of a married beneficiary and shall not be subject to attachment or susceptible of anticipation or alienation.
Notwithstanding this provision, the court entered judgment in garnishment against the bank as trustee for $50,500 arrearages *301 in alimony and medical expenses and $18,000 in attorney's fees. The court also entered a continuing writ of garnishment directing the bank to pay to the wife out of the trust the periodic and lump sum alimony as it becomes due.
The language of paragraph 5.2 appears adequate to constitute a spendthrift trust which would protect the beneficiaries' interests from invasion by their creditors. See Waterbury v. Munn, 159 Fla. 754, 32 So.2d 603 (1947). Though the quoted provision does not specifically exclude the claim of ex-spouses, the spendthrift language does not suggest any intent on the part of the settlor to make an exception for unpaid alimony. The bank contends that assets in the hands of a trustee under the terms of a spendthrift trust cannot be garnished for the collection of alimony.
The resolution of this issue involves a choice between competing interests. The cardinal rule of construction in trusts is to determine the intention of the settlor and give effect to his wishes. Cartinhour v. Houser, 66 So.2d 686 (Fla. 1953). Thus, in refusing to permit the invasion of a spendthrift trust for alimony, it has been said that "[w]hen unrestrained by statute it is the intent of the donor, not the character of the donee's obligation which controls the availability and disposition of his gift." Erickson v. Erickson, 197 Minn. 71, 78, 266 N.W. 161, 164 (1936). Accord Bucknam v. Bucknam, 294 Mass. 214, 200 N.E. 918 (1936); Dinwiddie v. Baumberger, 18 Ill. App.3d 933, 310 N.E.2d 841 (1974). On the other hand, there is a strong public policy argument which favors subjecting the interest of the beneficiary of a trust to a claim for alimony. Clay v. Hamilton, 116 Ind. App. 214, 63 N.E.2d 207 (1945); O'Connor v. O'Connor, 3 Ohio Op.2d 186, 141 N.E.2d 691 (Ohio Ct.Com.Pl. 1957); Shelley v. Shelley, 223 Or. 328, 354 P.2d 282 (1960); Dillon v. Dillon, 244 Wis. 122, 11 N.W.2d 628 (1943). As one court stated, the obligation to pay alimony "is a duty, not a debt." Safe Deposit & Trust Co. v. Robertson, 192 Md. 653, 65 A.2d 292 (1949).
The weight of authority permits the invasion of spendthrift trusts to collect unpaid alimony. See Annot., 91 A.L.R.2d 262 (1963). According to 2 A. Scott, The Law of Trusts § 157.1 (3d ed. 1967) (footnotes omitted):

Dependents of the beneficiary. Whether or not ordinary contract creditors can reach the interest of the beneficiary of a spendthrift trust, it has been held in a number of cases that his interest can be reached by his wife or children to enforce their claims against him for support. There are statutes in several states so providing. There are several grounds on which the dependents have been given protection.
In the first place, it has been held in a number of cases that a provision in the terms of the trust that the interest of the beneficiary should not be subject to the claims of creditors was not intended to apply to dependents of the beneficiary. They are not "creditors" of the beneficiary, and the liability of the beneficiary to support them is not a debt... .
Even though it is clear that the settlor intended to exclude the beneficiary's wife and children from enforcing their claims for support against his interest in the trust, it has been held in some cases that they are not thereby precluded from reaching the trust estate. This result has been reached on the ground that it is against public policy to permit the beneficiary to have the enjoyment of the income from the trust while he refuses to support his dependents whom it is his duty to support. The claim of a wife and dependent children to support is based upon the clearest grounds of public policy. They are in quite a different position from ordinary creditors who have voluntarily extended credit. It would be shocking indeed to permit a husband to receive and enjoy the whole of the income from a large trust fund and to make no provision for his needy dependents.
Accord Restatement (Second) of Trusts § 157 (1959). However, some of the cases representing the majority rule are controlled *302 by statute and others authorize the court which has jurisdiction over the trust to exercise its discretion to determine the extent of the alimony to be paid from the trust. E.g., Shelley v. Shelley; Restatement (Second) of Trusts § 157, comment on clause (a) (1959).
While our state has no statute on the subject, certain Florida decisions suggest an inclination toward the majority rule. The court in City of Miami v. Spurrier, 320 So.2d 397 (Fla. 3d DCA 1975), cert. denied, 334 So.2d 604 (Fla. 1976), held that it was against public policy to attempt to preclude the garnishment of a pension to satisfy an award of alimony, child support, and maintenance. In that case, an ex-wife was permitted to garnish monthly payments to the husband from the City of Miami's retirement fund even though the enacting ordinance specifically exempted the pension funds from garnishment. In Page v. Page, 371 So.2d 543 (Fla. 3d DCA 1979), the court indirectly approved the invasion of a spendthrift trust by directing the trial judge to take into consideration the income received by the father from a spendthrift trust in determining the proper amount of child support.
In light of our strong public policy toward requiring persons to support their dependents, we hold that spendthrift trusts can be garnished for the collection of arrearages in alimony. We also believe that a claim for attorney's fees awarded incident to the divorce is collectible in the same manner.
In our consideration of this appeal, we are hampered by the fact that the entire trust document was not made a part of the record. We are told by counsel, however, that the instrument provides for the husband to receive $50,000 from the corpus of the trust together with accrued income each December 10 until the corpus is exhausted. The lower court's original restraining order against the bank was entered on November 6, 1981; consequently, by the time the garnishment judgment was entered on April 11, 1983, the bank was holding more than $100,000 which was payable to the husband under the trust. Because this sum exceeded the amount of the arrearages, there is no need to consider whether the court could have gone so far as to order payment to the wife of any portion of the trust not yet payable to the husband. The same court had jurisdiction over both the dissolution and the trust; therefore, we may presume that the court has exercised its discretion in determining that the entire arrearages should be paid out of the trust. See Safe Deposit & Trust Co. v. Robertson.
The husband also complains of that portion of the order representing a continuing writ of garnishment to pay future alimony. He points out that section 61.12(2), Florida Statutes (1981), which authorizes continuing writs of garnishment to enforce orders for alimony and child support, refers only to the garnishment of an employer. However, the same result could be obtained under the provisions of section 61.11, Florida Statutes (1981), which reads as follows:
61.11 Effect of judgment of alimony.  A judgment of alimony granted under s. 61.08 or s. 61.09 releases the party receiving the alimony from the control of the other party, and the party receiving the alimony may use his alimony and acquire, use, and dispose of other property uncontrolled by the other party. When either party is about to remove himself or his property out of the state, or fraudulently convey or conceal it, the court may award a ne exeat or injunction against him or his property and make such orders as will secure alimony to the party who should receive it.
The remedy is drastic but appropriate to cope with the husband's misconduct. We, therefore, sustain the continuing aspect of the order in lieu of ne exeat as necessary to secure payment of alimony. The bank may continue to administer the trust according to its provisions, but to protect itself it will need to withhold all payments due to the husband in excess of alimony then due and owing in order to secure the future alimony payments. The bank is entitled to seek the *303 court's instructions, and the order is always subject to modification upon a proper showing by any interested party.
We also grant the wife's motion for appellate attorney's fees but only with respect to her attorney's services in the husband's appeal (case number 83-501). The trial court shall determine the appropriate amount of the fee and direct its payment from the monies owing the husband out of the trust.
The husband's arguments on appeal that the court entered postjudgment enforcement orders which were unduly punitive are totally without merit.
AFFIRMED.
SCHOONOVER, J., concurs.
LEHAN, J., concurs in part, dissents in part, with opinion.
LEHAN, Judge, concurring in part, dissenting in part.
I concur with the decision to permit invasion of the spendthrift trust by this ex-wife for alimony arrearages. But the majority opinion does not specifically limit other applications of that decision to cases with facts like those before us. I would specifically restrict the decision to this type of case, i.e., where the ex-wife has recourse for the payment of those arrearages against no property of the ex-husband, and invasion of the spendthrift trust is the last resort.
My main problem with the majority decision, however, is that the decision, because it does not specify otherwise, would apply not only to spendthrift trusts created hereafter but also to other similar trusts now in effect. I would specifically limit the application of this decision to the trust now before us, to other existing spendthrift trusts which are revocable and can be changed, and to spendthrift trusts created after the date of this decision. I do not concur with permitting retroactive application of this decision to other presently existing spendthrift trusts which are irrevocable by reason of the death of the settlors or for other reasons and which, therefore, cannot be amended by those settlors, if they would wish, in light of this decision.
The basis of the majority's decision is public policy. Although I concur with the majority's public policy declaration, I have not readily arrived at that concurrence. As explained below, my unwillingness to agree to retroactive application of this decision is related to the existence of substantial arguments which can be made against the declaration of that public policy. The more established as a part of the law are principles and doctrines (and, therefore, the more reliance which has been placed upon them by citizens in planning their conduct), the less inclined courts should be to change the law on the basis of public policy, especially the less inclined they should be to retroactively change the law on that basis.
Accordingly, a court should use with circumspection its power to change the law on public policy grounds. Any other use of that power would be detrimental to what is generally recognized as a bedrock feature of our system of jurisprudence: stability and certainty of the law through decisions based upon established legal principles and doctrines. If courts felt entirely free to use their perceptions of "public policy" as grounds to decide disputes on a case by case basis without regard to established legal principles and doctrines, citizens and their lawyers would be hard-pressed to predict the legal consequences of their conduct or, with confidence, to accomodate their conduct to the law.
Therefore, although, in the final analysis, I concur with the result and reasoning of the majority in declaring the public policy, I believe it is significant that there are strong public policy arguments against allowing invasion of a spendthrift trust for alimony arrearages. The very closeness and difficulty of the decision to adopt the public policy declared here is a further reason to not permit its retroactive application.
The remainder of this opinion undertakes to outline arguments to be overcome before deciding that public policy is a proper *304 ground for this decision and to then explain more specifically why and on what legal basis the decision should be made not retroactively applicable to other irrevocable trusts.

(A) Public Policy Is A Proper Ground For This Decision.

There are substantial arguments, pro and con, as to whether spendthrift trusts should be subject to the claims of an ex-wife for alimony. The majority opinion points out, with citations of authority, the argument which is most often made against that result: that the intent of the settlor should control the disposition of the gift.
The interest of that donor in the disposition of the property according to the terms of the trust is in the nature of a property right involving the right of the donor to not only select the person who will enjoy the donor's bounty but to specify how that bounty may not be used. This right has long been recognized in Florida which appellant argues has been a "strong" spendthrift trust state, in contrast to some other states which either do not recognize spendthrift trusts at all or which give such trusts limited recognition. See Waterbury v. Munn, supra; Croom v. Ocala Plumbing & Electric Co., 62 Fla. 460, 57 So. 243 (1911). "Spendthrift trusts are enforced and upheld as valid in Florida." 33 Fla.Jur. Trusts § 45 (1960). "[T]he trust device is extremely flexible and readily lends itself to carrying out the intent of the settlor... . In ... [Waterbury v. Munn, supra] the Florida court abandoned common-law abhorrence of the spendthrift trust." Note, Spendthrift Trusts, 22 U.Fla.L.Rev., 402, 407 (1949). I believe that at least many Florida lawyers who draft wills and trusts advise their clients, when asked, that in the final analysis what is "right" for the clients to do in the disposition of their property is what the clients in good faith desire to do, so long as it is not contrary to law.
The intent and desire of the settlor in the type of provision involved here is neither ambiguous nor unclear. The ex-wife is separately and directly excluded from the benefits of the trust and is not simply presumed to be included within the general category of excluded "creditors."[1] Emily H. Gilbert, the settlor, for reasons which we must assume had validity to her, did not want the appellee to get the trust property. This court is approving precisely what the settlor directed should not happen. When the settlor incorporated those provisions into her will she had every reason under Florida law to believe that her wishes would be carried out. The very fact that Emily H. Gilbert is deceased and cannot appear or argue on her own behalf presents a persuasive argument for respecting her wishes. But at least this court has not engaged in speculation used in some opinions in other states, that the settlor, if alive, would have agreed that the interests of society in enforcing the obligations of ex-spouses for alimony should be paramount, notwithstanding the spendthrift provisions. See Note, Trusts: Limitations on the Immunities of Spendthrift Trusts: Support and Alimony Claims, 44 Calif.L.Rev. 615, 617, n. 22 (1956).
I believe that this type of spendthrift trust provision is not unique. The majority opinion overrides not only the intent of Emily H. Gilbert but also, by retroactive effect, that of other settlors who have created similar trusts and who may have even more specifically evidenced by formal written instrument their intentions to exclude beneficiaries' husbands or wives.
Also, the property involved here was a gift and was not property accumulated by the ex-husband during the marriage; it is not the type of property to which an exspouse may be deemed entitled under the doctrine of equitable distribution in dissolution of marriage cases. The ex-wife had nothing to do with the accumulation of the *305 property, and, for that matter, the ex-husband is not the legal title holder of the property which was given by the donor to the trustee.
On the other hand, among the arguments for permitting the invasion of a spendthrift trust to pay the alimony claims of an exspouse are those well presented in the majority opinion. The obligation to pay alimony has been said to be not a debt, therefore the ex-wife is in a status entirely different from that of creditors. The legal unity of marriage has been said to impose a duty transcending mere contractual obligations which are rejected by the spendthrift provision. Most compelling is the argument that it would be not only unjust but would shock the conscience of the court and of any right-minded person to enable the beneficiary, as here, to enjoy the benefits of wealth without being subject to the responsibility to support those whom it is his legal obligation to support and who have no source for the payment of that obligation except the trust. See Spendthrift Trusts, 10 Gonz.L.Rev. 1 (1974); A Rationale for the Spendthrift Trust, 61 Colum.L.Rev. 1323 (1964); Note, Trusts: Limitations on the Immunities of Spendthrift Trusts: Support and Alimony Claims, supra.
The very existence of these arguments, pro and con, underline the difficulty of the issue and give reason for pause for thought as to the application of public policy as a ground upon which to resolve the issue. Also, there is a view that a decision like the one we make here should be left to the legislative branch of government. There are at least two arguments for that view which could apply here: (1) legislation is commonly not retroactive and, therefore, if the legislature were to permit the invasion of a spendthrift trust for payment of alimony arrearages, the intentions and justified expectations under prior Florida law of settlors of other existing, irrevocable spendthrift trusts would not be defeated; and (2) public policy decisions are more appropriately made by legislatures than the courts because legislatures are better equipped than courts to make those types of decisions. See Aldisert, The Judicial Process 333 (1976), quoting from Hopkins, Public Policy and the Formation of a Rule of Law, 37 Brooklyn L.Rev. 323, 323-25 (1971).
Yet the use of public policy by American courts as a valid ground for decision making is attested by the repeated use of that type of ground over many years. See White, Judicial Activism and the Identity of the Legal Profession, 67 Judicature 246-47 (1983). It may well be an abdication of a court's responsibility if it engaged in wishful thinking that the legislative branch of government would promptly, if at all, deal with a pressing matter which has been directly presented to a court. Courts no longer simply redress completed injuries and are generally recognized, especially through the declaratory judgment procedure, of having "a role also as general organs of public administration, competent to exercise a preventative jurisdiction through their declarations of rights." Schaefer, Precedent and Policy, 34 U.Chi. L.Rev. 3, 17 (1966). One interesting point of view is that legislatures are generally slow to modify established doctrines, and "individual victims of outworn and inequitable judicial doctrines have no lobby; for them, the court is a more promising forum than the legislature." Schaefer, The Control of "Sunbursts": Techniques of Prospective Overruling, 42 N.Y.U.L.Rev. 631, 640 (1967).
I share in principle the view that, generally speaking, although courts may at times declare public policy which they perceive to already exist, they should not create public policy except in the most urgent circumstances which abundantly manifest a public necessity by reason of basic, essential justice and fairness. This view is not entirely dissimilar to a more extreme view that a court should not use public policy as a basis for a decision when there exist substantial arguments pro and con, i.e., "It is only when a given policy is so obviously for or against the public health, safety, morals, or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the *306 community in so declaring." Aldisert, supra, at 334-35, quoting Hopkins.
Under that "extreme view," the result of the majority opinion, with most of which I concur, might be considered to be ill-advised because the issue before us is certainly legitimately debatable as outlined above. But, consistent with the reasoning of the majority opinion, I believe that our decision constitutes a proper declaration of public policy because, after weighing the arguments, the decision is required by considerations of basic justice and fairness with which the great bulk of those who have pondered the subject with disinterest would agree. In addition, all the law review articles and treatises to which we have been cited, as well as the Restatement (2d) of Trusts, support the majority result. In any event, judicial declarations of public policy ultimately can be acted upon by the legislative branch if it desires.

(B) This Decision Should Not Be Retroactively Applied to Other Irrevocable Spendthrift Trusts.

While I agree with the basic result reached in this case, I am disturbed (as indicated above) by the effect of this decision upon not only the Emily H. Gilbert Trust but upon similar spendthrift provisions in other existing irrevocable trusts which were created to express the settlors' intent and desire and were based upon what I believe to have been an accurate perception of Florida law at the time they were created. I believe that our decision in this case should be limited under the doctrine of "prospective overruling" so that it does not apply to other irrevocable spendthrift trusts.
Under prospective overruling, "a court overrules one of its own precedents but limits in some manner the customary retroactive sweep of its overruling decision." Schaefer, The Control of "Sunbursts": Techniques of Prospective Overruling, supra, at 631. As the majority opinion points out, this is a case of first impression in Florida. Therefore, it may be argued that the "prospective overruling" doctrine, strictly speaking, might not be precisely applicable. Nonetheless, the reasons for application of that doctrine to the instant case are, to me, extremely persuasive. Although we do not purport to overrule any prior Florida case law directly in point, the majority opinion does have the effect of defeating the justified expectation of other settlors who have irrevocably committed themselves under prior Florida law to provisions which we are now declaring ineffectual. Thus, the doctrine of prospective overruling seems fully applicable. Under that doctrine any other spendthrift trust provision like that at issue here would continue to be enforceable and effective as against alimony claims if contained in a trust which became irrevocable prior to this decision.
I would additionally apply what former Illinois Chief Justice Schaefer in the foregoing article referred to as "the first innovation" to the doctrine of prospective overruling, Id. at 638, and would apply our holding to the case before us, notwithstanding my endorsement of a general prohibition against retroactivity. In this manner, not only would equity and justice be done in this case and would the rights and expectations of other settlors who cannot amend their trusts be respected, but also one argument which has been made against the doctrine of prospective overruling would be defeated, to wit, "that since the litigant whose efforts brought about the change in judicial doctrine received no reward, other individual litigants would not be encouraged to attempt to reform the law through judicial decisions." Id. at 638. Thus, "the party who brings about the change in law [appellee here] may not properly be deprived of the fruits of his victory, whatever may be the situation as to others." Id. at 638.
By applying the first innovation to prospective overruling, this particular litigant would prevail, future law would be on the right course, and, at the same time, recognition would be given to the legitimate expectations of others who relied upon prior law and cannot change.
*307 This type of approach is not without precedent in Florida. See e.g., Smith v. Brantley, 400 So.2d 443 (Fla. 1981), where Justice England in his concurring opinion said:
We are constitutionally permitted, in the exercise of our judicial perogative, to determine whether any newly announced rule of law should be applied retroactively, or on a prospective basis only so as not to be available to the person who has raised the issue.
Id. at 453. Justice England went on to quote from Traynor, Quo Vadis, Prospective Overruling: A Question of Judicial Responsibility, 28 Hastings L.J. 533 (1976):
A court usually will not overrule a precedent ... when the hardship caused by a retroactive change would not be offset by the benefits. The technique of prospective overruling enables courts to solve this dilemma by changing bad law without upsetting the reasonable expectations of those who relied on it.
Id. at 453. See also Kratz v. Newsome, 251 So.2d 539, 541 (Fla. 2d DCA 1971), where Judge Mann referred to the law as being "full of instances in which a judge-made rule, relied on by trial judges, is altered for the future by the candid recognition that the rule ought to be different from now on."
There were a number of instances of non-retroactive judicial decisions even before Mr. Justice Cardozo brought the doctrine into focus in Great Northern Railway Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932); Schaefer, The Control of "Sunbursts": Techniques of Prospective Overruling, supra, at 631-32. Cardozo attributed his interest in dealing with the problem to Dean Wigmore. Id. at 632. Cardozo's first discussion of the problem apparently had been in 1921 when he said:
[I]n the vast majority of cases the retrospective effect of judge-made law is felt either to involve no hardship or only such hardship as is inevitable where no rule has been declared. I think it is significant that when the hardship is felt to be too great or to be unnecessary, retrospective operation is withheld.... I feel assured ... that ... [the line of division of cases which should and should not have retrospective effect] will be governed, not by metaphysical conceptions of the nature of judge-made law, nor by the fetich [sic] of some implacable tenet, such as that of the division of governmental powers, but by considerations of convenience, of utility, and of the deepest sentiments of justice
.....
Sunburst ... established the legitimacy of the technique of prospective overruling. That technique has been employed by many courts in this country, and in recent years by the Supreme Court of the United States as well.
Id. at 633, 644 [emphasis added].
It is significant in considering the application of that doctrine to the case now before us that "governmental immunity, charitable immunity, and intrafamily immunities have all involved prospective overrulings." Id. at 637. Why not then apply the doctrine here to a very real type of prior immunity of spendthrift trusts which, as stated above, I feel was a legitimate, justified expectation of trust settlors under prior Florida law? Although "any change in legal doctrine interferes with the uniform operation of law ..., as Wigmore pointed out: `equality is something desired for the person now under the law; it does not call for sameness of treatment between those of the present and those of the past or the future generation.'" Id. at 638. In any event, "the degree of disturbance of equality that is involved ... [in the application of the doctrine with the foregoing innovation] has not seemed too serious. It has appealed to many state courts as a permissible way to limit the extent to which reliance is frustrated without making the court's determination an academic exercise... ." Id. at 639.
Adoption of the doctrine of prospective overruling should, especially in a public policy case like this, finally depend upon whether or not the merits of the decision *308 are strong enough to warrant defeating the justifiable expectations of others through retroactive application of the decision. In fact, the doctrine itself depends for its application upon such prior expectations having been justified. "[A]ctual reliance should be the touchstone for prospective overruling." Id. at 642.

(C) Conclusion.

In the final analysis our decision involves weighing and balancing competing considerations. I recognize that the determinative factor here is whether the strength of the public policy declared in this case is sufficient to justify its application not only to this case but retroactively. I recognize that the effect of the majority opinion is that if that policy is strong enough to apply to the Emily H. Gilbert trust, it should be strong enough to apply retroactively to other similar existing, irrevocable trusts. But, as explained above, I feel that the strength of prior Florida law approving spendthrift trusts evidences well-justified past reliance by settlors upon Florida law for the expected effectiveness of spendthrift trust provisions like that here.
I am certain that the majority judges do not disagree that a major consideration is stability and certainty of the law on the basis of which citizens should be able with confidence to accommodate their conduct to the law, certainly in the effectuation of a legal act as solemn and important to them as the making of a will. It is especially important for courts to foster future confidence in the law by manifesting their recognition of that consideration. Also, some uncertainty from retroactivity of this public policy decision would likely result for testators and trustors generally as well as for those involved with existing, irrevocable spendthrift trusts of various other types, who may question, in light of this decision, whether other public policy oriented decisions could cast doubt upon or destroy the efficacy of provisions of their wills and trusts.
I feel that the foregoing considerations should counterbalance the legitimate interests of those relatively few ex-spouses who may feel the need to invade spendthrift trusts of the type involved here. I feel that the public policy declared in this case should not, and need not under the doctrine of prospective overruling, defeat the justified expectations of other settlors.
In short, I don't favor the idea of changing principles of law governing wills and trusts after it is too late for testators and settlors to change their wills and trusts. I think that lack of judicial favor for that idea should be manifested. This in no sense means that the majority opinion, which, as I have agreed above, has much merit, is manifestly erroneous. Again, resolution of the issue here is a matter of the balancing of interests.

ON MOTION FOR REHEARING AND CERTIFICATION
PER CURIAM.
Three days before the issuance of our opinion and unknown to this court at the time, the Third District Court of Appeal entered a split decision holding that the income from spendthrift trusts is exempt from legal process to enforce a court ordered payment of alimony and attorney's fees to an ex-wife. White v. Bacardi, 446 So.2d 150 (Fla. 3d DCA 1984). While we recognize the force of the arguments expressed by the majority opinion in that case, we believe that our opinion, as well as Judge Schwartz's dissent, represents the better view and one which is consistent with the weight of authority in other jurisdictions.
We deny the motions for rehearing, but we hereby certify this case to the Supreme Court of Florida as being in direct conflict with White v. Bacardi. Art. V, § 3(b)(4), Fla. Const.
GRIMES, A.C.J., and SCHOONOVER, J., concur.
LEHAN, J., concurs in part and dissents in part.
*309 LEHAN, Judge, concurring in part, dissenting in part.
I adhere to my prior opinion from which, I trust, my views concerning the carefully considered majority and dissenting opinions in White v. Bacardi are self-evident. I concur with the certification of this case to the Florida Supreme Court.
NOTES
[1] As the majority points out, the fact that the provision involved here refers to a "spouse" and does not refer to an "ex-spouse" is of no moment. That the settlor intended to exclude a spouse of a beneficiary, while that person is in the legal status of a spouse, seems a strong reason to conclude that, a fortiori, a spouse should not be included when becoming an ex.