**STATE ex rel. TRAPP, Acting Governor, v. CHAMBERS, District Judge, et al.**

No. 14819—Opinion Filed Nov. 7, 1923.

(Syllabus.)

1. **Constitutional Law—Impeachment Proceedings—Review by Courts.**

The Legislature, being otherwise in legal session, is, by the Constitution, given definite governmental duties, and has exclusive jurisdiction over matters of impeachment, and the actions of the Senate and House of Representatives, in the exercise of this jurisdiction, are not subject to review or interference by the courts.

2. **States—"Impeachment" — Effect on Office of Governor.**

"Impeachment" of the Governor, within the meaning of section 16, art. 6, of the Constitution, is the adoption of articles of impeachment by the House of Representatives, and the presentation thereof to the Senate, and the indication by that body that the same are accepted for the purpose of permitting prosecution thereof, and the impeachment of the Governor operates to suspend him; the duties and emoluments of the office automatically devolving upon the Lieutenant Governor for the remainder of the term or until the disability is removed by the acquittal of the Governor of the charges preferred against him.

3. **Same—Lieutenant Governor as Chief Executive.**

During the pendency of an impeachment, the Lieutenant Governor is the Chief Executive of the state; and the suspended Governor being a mere private citizen, may not interfere with the former in the rightful exercise of his duties, either by force or by legal proceedings.

4. **Constitutional Law — Prohibition—Attempt of Court to Enjoin Lieutenant Governor from Assuming Duties of Chief Executive on Impeachment of Governor.**

The issuance of an injunction by a district court against the Lieutenant Governor, preventing him from assuming the duties as Acting Governor, is an encroachment upon the executive department and an attempt to pass upon questions solely within the province of the other governmental departments, and prohibition will lie to prevent this unwarranted and unauthorized application of judicial force.

5. **Courts — Supreme Court—Prohibition**

·Against Inferior Courts.

The Supreme Court of this state, being vested with supervisory powers over the district courts, has the power to issue writs of prohibition where such inferior tribunals assume to exercise judicial powers not granted by law, or attempt to make an unauthorized application of judicial force.

**6. Courts—Power of Supreme Court to Enjoin Interference with Lieutenant Governor on Impeachment of Governor.**

This court has the power to issue injunctions in support of its decisions; and where it is shown that a private citizen is attempting to interfere with the acting Chief Executive of the state, and this court having determined that such interference was unwarranted, held, that injunction should issue to restrain that person from such interference.

Application by the State of Oklahoma, on the relation of M. E. Trapp, Acting Governor, for writ of prohibition to the District Court of Oklahoma County, against Tom C. Chambers, Sr., Judge, and J. C. Walton, and for restraining order. Writ issued, and restraining order granted.

George F. Short, Atty. Gen., and John Barry, Edwin Dabney. and Leon S. Hirsh, Asst. Attys. Gen., for plaintiff.

F. E. Riddle, Warren K. Snyder, H. B. Martin, Tom W. Neal, and H. G. McKeever, for defendants.

HARRISON, J. This is an original action filed in this court on relation of M. E. Trapp, Acting Governor, by the Attorney General of the state, for a writ of prohibition against a district judge, prohibiting such judge from restraining or in any wise interfering with the actions of relator, while acting as Governor of the state of Oklahoma, in the discharge of the executive duties of the Governor of the state, under the color of the office of Governor.

·The petition also prays for an order restraining J. C. Walton, the temporarily suspended Governor, from interfering with the said M. E. Trapp, in the discharge of his duties as acting Governor.

The district court, upon the assumption that said M. E. Trapp was acting without authority, granted the temporary restraining order, restraining Trapp from assuming the duties of temporary Governor. and from interfering with the duties of J. C. Walton as Governor, and had set a day later for hearing cause why permanent injunction should not issue against Trapp. The facts upon which the district court acted were that the Legislature. being legally in special session, the lower house of same, had, upon inquiry and upon testimony taken, filed articles of impeachment against Governor J. C. Walton, as Governor, with the Senate, which was then in special session as a Senate, whereupon the Senate as such automatically took cognizance of its jurisdiction and duties as a court of impeachment and passed a resolution temporarily suspending J. C. Walton from office as acting Governor. and temporarily installing M. E. Trapp, Lieutenant Governor, as Acting Governor, pending the trial of the articles of impeachment filed against the Governor by the House of Representatives, and upon the assumption either that the filing of the charges did not temporarily suspend the Governor from office or upon the assumption that the resolution passed by the Senate was not warranted by law, or upon both assumptions, the district court assumed jurisdiction to restrain M. E. Trapp from acting as Governor, and from interfering with J. C. Walton in his acts as Governor.

The questions presented here are whether the district court had jurisdiction to interfere with the Acting Governor, acting under color of office, and whether this court had jurisdiction to interfere, by writ of prohibition with the district court and to restrain J. C. Walton as an individual from interfering with the duties of the Acting Governor. There was a demurrer filed to the sufficiency of the Attorney General's petition but the facts alleged were sufficient to give this court a definite knowledge as to what the district judge had acted upon, and as to what his actions were, and also as to what was asked of this court, this is substantially all that is required in a petition, and it was made clear from the argument on demurrer that counsel for defendant definitely knew what action in the trial court was complained of, what the trial court had done, what he acted upon, and. what was asked of this court; hence the demurrer was properly overruled.

Logically as well as from a standpoint of law, the entire proposition hinges upon the meaning of the word or term "impeachment," as used in our Constitution.

Section 16, art. 6, Williams' Constitution reads.

"In case of impeachment of the Governor, or of his death, failure to qualify, resignation, removal from the state, or inability to discharge the powers and duties of the office. the said office, with its compensation. shal devolve upon the Lieutenant Governor for the residue of the term or until the disability shall be removed."

The Constitution does not definitely de-

fine the term "impeachment," but in section 1 of article 8 (section 211, of Williams' Constitution), the impeachment officers are defined, and section 1 of article 7 of the Constitution and article 8, Id., confers exclusive jurisdiction upon the Legislature and defines the duties of each house in cases of impeachment. This, in the absence of provisions to the contrary, would logically imply that courts have no jurisdiction over nor power to interfere in cases of impeachment.

While the Constitution does not attempt to define the terms "impeachment," nor the extent of its meaning, nor expressly authorize the Legislature to define its meaning, yet it nowhere prohibits the Legislature from defining the term and the extent of its meaning; hence, having given the Legislature exclusive jurisdiction in impeachment matters, and not having limited the Legislature in defining the term, it was a valid exercise of legislative authority for the Legislature to define what is meant by the term "impeachment" as used in the Constitution.

The act of 1915, (section 152, Comp. Stat. 1921), defines impeachment as follows:

"An impeachment is the prosecution, by the House of Representatives, before the Senate, of the Governor or other elective state officer, under the Constitution, for wilful neglect of duty, corruption in office, drunkenness incompetency, or any offense involving mortal turpitude committed while in office."

This was a valid exercise of legislative authority, and having been regularly passed and duly approved March 12, 1915, and, not having been repealed, is the law of the state and binding upon the courts, and the Legislature having defined such term and having interpreted it to mean temporary suspension of the officer accused when articles of impeachment are duly filed with the Senate and duly accepted and filed by the Senate, and the Senate, with exclusive jurisdiction as a court of impeachment having likewise interpreted the term to mean a temporary suspension of the Governor, pending a trial under the articles of impeachment, and having by resolution duly notified the parties affected, it is clear that the courts have no authority to interfere.

And in this connection we think it proper to say that the Legislature was supported by good authority, perhaps by the weight of authority in its definition and interpretation of the term "impeachment," as used in our Constitution. It will be observed that section 16, art. 6, of the Constitution reads:

"In case of impeachment of the Governor, * * * the said office, with its compensation, shall devolve upon the Lieutenant Governor for the residue of the term or until the disability shall be removed."

The Legislature with exclusive jurisdiction in impeachment matters or in the matters pertaining to impeachment of impeachable officers, have interpreted this to mean that the filing of articles of impeachment impose or constitute a disability, which temporarily suspends the Governor until the Senate, sitting as a court of impeachment with exclusive jurisdiction, removes such disabilities. In this they are supported, at least by highly respectable authority, if not by the weight of authority. Probably the first intimation of the correctness of such interpretation is the latter sentence of section 3, art. 8, of the Constitution, which reads:

"The House of Representatives shall present all impeachments."

We cannot authoritatively say that the articles of impeachment, which the House of Representatives files, do not constitute an impeachment. In addition to this section 4 of article 8 reads:

"When the Senate is sitting as a court of impeachment, the Senators shall be on oath, or affirmation impartially to try the party impeached. * * *"

This would further support the interpretation given the term by the Legislature, that such term means when the articles of impeachment are filed with the Senate and duly accepted by the Senate, that the party charged is then impeached, at least to the extent of being temporarily suspended; and, taking the section altogether, in connection with section 5 of the same article, it would mean that, in case the Senate, as a court of impeachment, found the charges to be true, it would enter its judgment accordingly and make a final order of removal.

In this connection it might be proper to suggest, as the question has been raised in the course of this trial, that the Senate when sitting as a legislative body indicates its sense, on a given proposition, by a resolution, but when sitting as a court it should indicate its judgment, on a proposition, by order as any other court.

Reverting to the original question under consideration viz., the authority which the Legislature had in support of its interpretation of the word "impeachment," as used in our Constitution Black's Law Dict. defines the term "impeached" as follows:

"Impeach. To accuse, to charge a liability upon, to sue. * * * To proceed against

a public officer for crime or misfeasance before a proper court by the presentation of a written accusation, called, 'articles of impeachment.'"

Also section 271, p. 565, 22 R. C. L., the following:

"Usually the lower house of the Legislature has the sole power of impeachment, the upper house, or Senate, sitting as a court for the trial of the impeachment"— citing Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377; Dullam v. Wilson, 53 Mich. 392, 19 N. W. 112, 51 Am. Rep. 128.

Literary lexicographers use the word as synonymous with accusation, indictment, etc. Webster's New Inter. Dic. defines it as follows:

1. Impeach, v. t. impeached, to prevent, hinder bar.

2. To prove an accusation against * * * to charge with a crime or misdemeanor; to be accused: to charge (a public officer), before a competent tribunal, with misbehavior in office: to cite before a tribunal for official misconduct; to arraign.

After the word "Impeachment," Mr. Webster deduces its meaning in law to be a calling to account for some high crime or offense before a competent tribunal; arraignment, especially of a public officer for misconduct while in office.

In Fallows' Syn. & An., a recognized authority on the synonymous meaning of words, the word "impeached" is used in the sense of accuse, arraign, indict, criminate. This meaning has been recognized in the Sulzer Case by the Supreme Court of New York (People ex rel. Robin v. Hayes, 163 App. Div. 725, 149 N. Y. Supp. 250), also by the Nebraska court (In re Opinion of the Judges, 3 Neb. 464), and the Florida court (In re Opinion of Justices, 14 Fla. 289); also 15 Am. & Eng. of Law (2d Ed.) 1060, which says: "To impeach, as applied to a person, is to accuse, to censure, to blame." Therefore we conclude that the Legislature was supported by what might well be termed the weight of authority in its definition of the meaning, significance, and extent of the term "impeachment," as used in our Constitution.

The Supreme Court having express authority under section 2, art. 7, of the Constitution as follows:

"The original jurisdiction of the Supreme Court shall extend to a general superintending control over all inferior courts and all commissions and boards created by law"—

has power to prohibit district courts from exceeding their authority under the law, when such matters are properly presented, likewise, when the Legislature, by the exercise of its authority in impeachment matters, had suspended the Governor from office, and the Lieutenant Governor, having automatically become the Governor, was then not subject to control by the courts, under State v. Huston, 27 Okla. 606, 113 Pac. 190, 34 L. R. A. (N. S.) 380, and Bynum v. Strain, 95 Okla. 45, 218 Pac. 883. Likewise the Governor, having been temporarily suspended, became a mere private citizen, over whom the courts have jurisdiction to restrain from interfering with the executive duties of the acting Governor, the Lieutenant Governor, as defined by section 16, supra.

Therefore it is the opinion of the court that the alternative writ of prohibition heretofore issued to Hon. T. G. Chambers, Sr., judge of the district court of Oklahoma county, should be and the same is hereby made peremptory and permanent, and that a temporary restraining order should issue to Hon. J. C. Walton, temporarily restraining him from interfering with the duties of M. E. Trapp while acting as Governor, until final determination of the articles of impeachment against the Hon. J. C. Walton, as Governor, by the Senate of the state of Oklahoma, sitting and acting as a high court of impeachment, and that writs in due and proper form be issued, in accord with this opinion.

KENNAMER, NICHOLSON, COCHRAN, BRANSON, and MASON, JJ., concur.

JOHNSON, C. J., presiding in the Senate Court of Impeachment, not participating.