JAMES H. KINSELLA *v.* ROBERT G. JAEKLE ET AL.
(12270)
(12356)

SPEZIALE, C. J., PETERS, GRILLO, SPONZO and MENT, Js.

Argued January 17—decision released April 17, 1984

*James A. Wade,* with whom were *Sally S. King, Sylvia Kemp-Orino* and, on the brief, *Edward F. Hennessey,* for the plaintiff.

*Joseph I. Lieberman,* attorney general, with whom were *Daniel R. Schaefer, David M. Teed* and, on the brief, *Barney Lapp,* assistant attorneys general, for the defendants.

SPEZIALE, C. J. This case concerns a challenge to the constitutionality of an investigation to consider impeachment proceedings currently being conducted by a select committee of the Connecticut House of Representatives. The matter has come before this court both on appeal from an interlocutory order of the trial court and on reservation by the trial court of several questions of law for our advice. Under the circumstances of this case, we hold that the Superior Court does not have jurisdiction to hear the plaintiff's action.

The parties have stipulated to the following relevant facts: The plaintiff, James H. Kinsella, is the elected judge of probate for the Hartford Probate District. He was first elected to that position in November, 1960, and has been re-elected to each successive term since. The defendants are members of the Connecticut House of Representatives[1] and have all been appointed to a

---

[1] The members of the House of Representatives named as defendants in the complaint are: Robert G. Jaekle, Robert F. Frankel, Teresalee Bertinuson, Elinor F. Wilber, Beatrice K. Murdock, Yorke Allen, Jr., Richard Tulisano, and John Wayne Fox.

select committee (hereinafter the committee) to consider institution of impeachment proceedings against the plaintiff, pursuant to House Resolution No. 26,[2] adopted April 27, 1983, and House Resolution No. 30,[3] adopted June 6, 1983.

[2] House Resolution No. 26 (1983) provides:

"RESOLUTION PROPOSING THE APPOINTMENT OF A SELECT COMMITTEE TO CONSIDER INSTITUTION OF IMPEACHMENT PROCEEDINGS AGAINST JAMES H. KINSELLA, JUDGE OF PROBATE.

"Resolved by this House:

"That the Speaker of the House refer to a committee of house members this resolution, with instructions to (1) review the findings of the council on probate judicial conduct, on which the public censure of James H. Kinsella, judge of probate, was based, and any other facts or circumstances relating to the conduct of James H. Kinsella as a judge of probate which it deems necessary or advisable, and (2) to submit to the house of representatives its findings and recommendations, including, if it concludes such action is warranted, articles of impeachment describing the acts or omissions with which James H. Kinsella as judge of probate is charged."

[3] House Resolution No. 30 (1983) provides:

"RESOLUTION CONTINUING THE COMMITTEE CONSIDERING THE INSTITUTION OF IMPEACHMENT PROCEEDINGS AGAINST JAMES H. KINSELLA, JUDGE OF PROBATE.

"Resolved by this House:

"WHEREAS, the committee on impeachment created by House Resolution 26, as amended by House Amendment Schedule 'A,' to consider institution of impeachment proceedings against James H. Kinsella is continuing its investigation; and

"WHEREAS, it appears that extensive testimony still to be heard and findings still to be reviewed and investigated by the committee will preclude completion of its work prior to June 8, 1983, the adjournment date of the 1983 regular session of the general assembly;

"NOW, THEREFORE BE IT RESOLVED, that the committee on impeachment, as created by House Resolution 26, as amended by House Amendment Schedule 'A', and as constituted by the Speaker of the House, continue its investigation of James H. Kinsella after the adjournment sine die of the 1983 regular session of the general assembly;

"BE IT FURTHER RESOLVED, that during its continuing investigation the committee shall have all the powers granted to it by House Resolution 26, as amended by House Amendment Schedule 'A' and all the powers of any committee of the general assembly under section 2-46 of the general statutes."

■■■■■■■■

The Council on Probate Judicial Conduct, acting pursuant to General Statutes § 45-11g,[4] had investigated certain aspects of the plaintiff's conduct in connection with probate matters over which he had presided. On

---

[4] At all times pertinent to this case General Statutes § 45-11g provided: "(a) The council shall, after the hearing provided under section 45-11f, prepare a report of its investigation and a recommendation as to whether the judge of probate investigated should be publicly reprimanded, publicly censured or exonerated of the allegations of the complaint.

"(b) If public reprimand is recommended, the chairman shall prepare and forward the reprimand in writing to the judge of probate being reprimanded, signing the reprimand as chairman of the council. A judge may, within twenty days after receiving notice of reprimand by the council, appeal to the supreme court of Connecticut. A judge filing an appeal shall give notice of its filing to the council before the expiration of time for filing of an appeal. The council shall, within two weeks following receipt of notice of an appeal, file a finding of fact and conclusions therefrom. The pendency of an appeal shall stay the publication of notice of the censure appealed from and all facts relating to it. The supreme court may, upon application after hearing with notice to the council and appellant, make orders, including publication of the fact of reprimand and all matters relating to reprimand, in whole or in part, which will best serve the public interest pending final decision on the appeal. If no appeal is taken by the judge or upon determination of the appeal at the direction of the supreme court, a copy of the reprimand shall be furnished the chief justice, the chief court administrator, the probate court administrator, the president-judge of the Connecticut probate assembly, the town clerk or clerk in each town in the district served by such judge of probate and the complainant.

"(c) If public censure is recommended, the chairman shall prepare and forward the censure in writing to the judge of probate being censured. A judge may, within twenty days after receiving notice of public censure by the council, appeal to the supreme court of Connecticut. A judge filing an appeal shall give notice of its filing to the council before the expiration of time for the filing of an appeal. The council shall, within two weeks following receipt of notice of an appeal, file a finding of fact and conclusions therefrom. The pendency of an appeal shall stay the publication of notice of the censure appealed from and all facts relating to it. The supreme court may, upon application after hearing with notice to the council and appellant, make orders, including publication of the fact of censure and all matters relating to the censure, in whole or in part, which will best serve the public interest pending final decision on the appeal. If no appeal is taken by the judge or upon determination of the appeal at the direction of the supreme court, a copy of the censure shall be furnished to the chief justice, the chief court administrator, the probate court administrator, the president-judge

April 11, 1983, the Council on Probate Judicial Conduct recommended public censure of the plaintiff, which the plaintiff is now appealing.[5] Although § 45-11g authorizes the Council on Probate Judicial Conduct to recommend impeachment to the House of Representatives, the council did not do so. Nevertheless, the House of Representatives created the committee for the purpose of considering the institution of impeachment proceedings against the plaintiff. House Resolution No. 26 (1983); House Resolution No. 30 (1983).

On May 13, 1983, the plaintiff filed an action in the Superior Court challenging the committee's investigation on constitutional grounds. In his complaint the plaintiff requested declaratory relief and both a temporary and a permanent injunction prohibiting further investigation by the committee.

On June 22, 1983, subpoenas were issued to the defendant Robert G. Jaekle and the defendant Robert F. Frankel, cochairmen of the committee. The defendants then moved to quash those subpoenas claiming both lack of court jurisdiction over the subject matter of the plaintiff's action and immunity from compulsory court testimony under the speech or debate clause of

of the Connecticut probate assembly, the town clerk or clerks in each town in the district served by such judge of probate and the complainant.

"(d) If, in the judgment of the council,the facts so warrant, it may recommend to the house of representatives the institution of impeachment proceedings.

"(e) If the council exonerates a judge of probate, a copy of the proceedings and report of the council shall be furnished to the judge, the probate court administrator and the complainant.

"(f) Except as provided in subsections (b) and (c), all decisions of the council shall be public record and shall be available for inspection at the office of the probate court administrator."

Public Acts 1983, No. 83-379, has since amended this section.

[5] The plaintiff has appealed separately the council's recommendation of censure. That appeal (Council on Probate Judicial Review re: Kinsella, Docket No. 12123) was heard on February 29, 1984.

the Connecticut constitution, article third, § 15. The trial court denied the motion to quash.

The defendants filed a motion to dismiss the action on July 9, 1983, again claiming that the trial court was without subject matter jurisdiction to entertain the complaint and also that the defendants were immune from court jurisdiction over them by virtue of the speech or debate clause. The defendants further claimed that the court had no jurisdiction over the complaint because it involved a nonjusticiable political question. The trial court did not rule on this motion to dismiss. Instead, it delayed decision on all jurisdictional matters and ordered that the hearings concerning the preliminary injunction continue. The trial court overruled the defendants' objection to the continuation of proceedings before the jurisdictional question was decided.

On July 13, 1983, the defendants appealed to this court claiming error in the trial court's overruling of their objection to the continuation of proceedings before a determination of jurisdiction was made and in the trial court's refusal to quash the subpoenas issued to the defendants Jaekle and Frankel.[6] While that appeal was pending, the trial court, on October 25, 1983, at the request of the parties, reserved for the advice of this

---

[6] The defendants appealed pursuant to General Statutes § 52-265a. Unlike § 52-263, which provides for appeals only after final judgment has been rendered, § 52-265a provides that "any party to an action who is aggrieved by an order or decision of the superior court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the supreme court within two weeks from the date of the issuance of the order or decision." If within one week of the appeal's filing the chief justice certifies "that a substantial public interest is involved and that delay may work a substantial injustice," the appeal may be entertained by the Supreme Court. General Statutes § 52-265a (b) and (c); see Public Acts, Spec. Sess., June, 1983, No. 83-29, § 2 (b) (9). On July 20, 1983, the chief justice so certified the issues presented in the defendants' appeal.

court several questions of law to which the parties had stipulated. See Practice Book § 3133. The defendants' appeal was then combined with the reservation.

The reservation includes several questions or sub-questions.[7] The appeal presents three claims of error,

---

[7] The following questions were reserved:

"A. Does the legislature have exclusive jurisdiction over impeachment in this case so as to warrant dismissal of the complaint by the Superior Court for lack of subject matter jurisdiction?

"B. Even if the answer to Question A is in the negative, does impeachment in this case involve a non-justiciable political question thereby requiring dismissal of the complaint by the Superior Court?

"C. Even if the answers to Questions A and B are in the negative, does the Speech or Debate Clause of the Connecticut Constitution provide immunity to the defendants so as to deprive the court of subject matter jurisdiction thereby requiring dismissal of the complaint by the Superior Court or does that Clause otherwise bar this action?

"D. If the answers to Questions A and B are in the negative, and the answer to Question C is in the affirmative, would the joinder of the State Comptroller as a party defendant be permissible?

"E. If the answers to Questions A and B are in the negative, and the answers to Questions C and D are in the affirmative, would the joinder of State Comptroller, together with the enactment of P.A. 83-29, § 81, June Spec. Sess., vest this Court with jurisdiction to hear and determine the issues raised here or otherwise permit this action to proceed?

\*      \*      \*      \*      \*

"The parties hereby stipulate and agree that the following questions need not be answered unless and until it is determined through the answers to all the above questions that this action is not barred by lack of jurisdiction, nonjusticiability, or the Speech or Debate Clause.

"F. Did the Superior Court err in denying defendants' Motion to Quash subpoenas issued to certain legislators protected under Article Third, Section 15, the Speech or Debate Clause of the Connecticut Constitution?

"G. Is the Connecticut General Assembly empowered by virtue of Article Ninth, § 3 of the Connecticut Constitution to conduct impeachment proceedings against a probate judge elected to his office and holding the same pursuant to Article Fifth, § 4 of said Constitution?

"H. Does Article Ninth of the Connecticut Constitution violate Amendment XIV, § 1 to the United States Constitution by virtue of the allegations contained in ¶7b of the Complaint?

"I. Is Article Ninth of the Connecticut Constitution unconstitutional as

which are essentially coterminous with three of the reserved questions.[8] The first reserved question asks: "Does the legislature have exclusive jurisdiction over impeachment in this case so as to warrant dismissal of the complaint by the Superior Court for lack of subject matter jurisdiction?" We hold that under the circumstances of this case the legislature does have exclusive jurisdiction and that therefore the trial court must dismiss the plaintiff's action. Thus, it is unnecessary to answer the remaining reserved questions and the questions raised by the defendants' appeal. The appeal is dismissed as moot. See *State* v. *Sanabria,* 192 Conn. 671, 681, 474 A.2d 760 (1984).

---

being in contravention of any of the following provisions of said Connecticut Constitution:

  i. Article First, § 8

  ii. Article First, § 9

  iii. Article First, § 10?

"J. Acting pursuant to Conn. Gen. Stat. § 45-11d, the Council on Probate Judicial Conduct issued a memorandum of decision which memorandum makes no reference to, or mention of, impeachment.

"Is the General Assembly, by virtue of said memorandum and the action of the Council under Conn. Gen. Stat. § 45-11d, barred from commencing impeachment proceedings because of:

  i. The doctrine of legal or equitable estoppel?

    or

  ii. Amendment Eleventh to the Constitution of the State of Connecticut?,

    or

  iii. The doctrine of res judicata?

"K. Does Article Ninth of the Connecticut Constitution grant authority to the House of Representatives to impeach a probate judge for alleged activities occurring prior to his election to his present term of office?"

[8] On appeal the defendants claimed the following issues:

"1. Whether the Superior Court erred in overruling defendants-appellants' objection to the Court proceeding further without deciding the issue of jurisdiction.

"2. Whether the Superior Court erred in denying defendants-appellants' motion to quash subpoenas issued to certain legislators protected under Article Third, Section 15, the Speech or Debate Clause of the Connecticut Constitution.

"3. Whether the Superior Court erred in refusing to quash the subpoenas in view of the fact that the Court lacked subject matter jurisdiction over impeachment which is in the exclusive jurisdiction of the legislature."

712

Article second of the Connecticut constitution[9] vests the powers of government in "three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another." Article fifth, as amended by amendment twenty to the constitution,[10] establishes as the repositories of the judicial power the Supreme Court, the Appellate Court, the Superior Court, and such lower courts as the General Assembly shall establish. Article fifth adds: "The powers and jurisdiction of these courts shall be defined by law."

The constitution itself does not enumerate the powers of the courts or the specific matters over which they have jurisdiction; nor does it define the judicial power with which they are vested. Pursuant to article fifth, however, the General Assembly has provided for both civil and criminal jurisdiction in the Superior Court. See generally General Statutes chapters 882, 895 and 959. "The superior court shall be the sole court of original jurisdiction for all causes of action, except such actions over which the courts of probate have original jurisdiction, as provided by statute." General Statutes § 51-164s. Among the powers specifically granted to the Superior Court are the powers to issue declaratory judgments and injunctions. General Statutes

[9] "ARTICLE SECOND.
OF THE DISTRIBUTION OF POWERS.
"(Distribution of powers.)
"The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."
[10] Amendment twenty to the constitution provides:
"Section 1 of article fifth of the constitution is amended to read as follows:
"The judicial power of the state shall be vested in a supreme court, an appellate court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish. The powers and jurisdiction of these courts shall be defined by law."

§§ 52-29 (a) and 52-471 (a). It does not necessarily follow, however, that the Superior Court may afford such relief to one who challenges legislative inquiry purportedly taken under the House of Representatives' impeachment power.

In spite of its general conferral of all judicial power on the courts, the constitution unequivocally commits the power of impeachment and removal from elected office to the General Assembly. Article ninth,[11] § 1 commands that the House of Representatives shall have the "sole power of impeaching." Section 2 of that article requires that "[a]ll impeachments shall be tried by the senate." The constitution leaves no doubt but that impeachment proceedings may be brought and tried only in the General Assembly. The courts are powerless to impeach any official.

The narrow question before us, therefore, is whether the Superior Court has jurisdiction by virtue of its

---

[11]    "ARTICLE NINTH.
                    OF IMPEACHMENTS.
"(Power of impeachment.)
    "SEC. 1. The house of representatives shall have the sole power of impeaching.
"(Trial of impeachments.)
    "SEC. 2. All impeachments shall be tried by the senate. When sitting for that purpose, they shall be on oath or affirmation. No person shall be convicted without the concurrence of at least two-thirds of the members present. When the governor is impeached, the chief justice shall preside.
"(Liability to impeachments.)
    "SEC. 3. The governor, and all other executive and judicial officers, shall be liable to impeachment; but judgments in such cases shall not extend further than to removal from office, and disqualification to hold any office of honor, trust or profit under the state. The party convicted, shall, nevertheless, be liable and subject to indictment, trial and punishment according to law.
"(Treason.)
    "SEC. 4. Treason against the state shall consist only in levying war against it, or adhering to its enemies, giving them aid and comfort. No person shall be convicted of treason, unless on the testimony of at least two witnesses to the same overt act, or on confession in open court. No conviction of treason, or attainder, shall work corruption of blood, or forfeiture."

judicial power under the constitution to enjoin àn investigation by the House of Representatives that is conducted under specific constitutional authority. The defendants argue that in committing the *sole* power of impeachment to the House of Representatives, the constitution not only prohibits the courts from impeaching a state official, but also bars the courts from even hearing a challenge to any proceeding undertaken pursuant to that power.

A determination of this question requires some historical analysis of the judicial authority in Connecticut and of the common law roots of the impeachment and removal process. In the preface to the first volume of the Connecticut Reports, Thomas Day summarized the state of the judiciary as it had evolved to that point, just before the adoption of the constitution of 1818. Day observed that "[i]n the origin of our government, the legislative body possessed and exercised the whole judicial power." Day, Preface to Connecticut Reports, 1 Conn. iii (1816); see *State* v. *Clemente*, 166 Conn. 501, 512–13, 353 A.2d 723 (1974); see generally Loomis & Calhoun, The Judicial and Civil History of Connecticut (1895).

In 1636 the first formal government of what is now the state of Connecticut was created when the Massachusetts General Court issued a commission to several expatriates of that colony who moved south and settled along the Connecticut River on or near land that is now part of the city of Hartford. Day, supra, iii. The commission established a commissioners' court, composed of certain named settlers, in which was vested all legislative and judicial power. Id. When that commission expired a year later the settlers established an independent government. The commissioners' court was succeeded by a general court, which again possessed both legislative and judicial powers. Id., iv.

In 1639 the residents of Connecticut, which then comprised the towns of Windsor, Hartford and Wethersfield, adopted their first constitution, the Fundamental Orders of 1638–39. The Fundamental Orders decreed that the general court should be composed of at least six magistrates and one governor; Fundamental Orders § 1; vested with the "supreme power of the Commonwealth" in executive, legislative, and judicial matters. Fundamental Orders § 10; see 1 Colonial Records of Conn. 220–24. The general court established the first tribunal of exclusively judicial authority in 1638 when it created the particular court, to which the general court assigned the trial of cases on an ad hoc basis. Day, supra, iv-vi.

In 1665 the commonwealths of Connecticut and New Haven joined together and became a colony of Great Britain under charter of King Charles II. Charter of 1662; Day, supra, ix-x. The charter substituted a General Assembly for the general court and vested the General Assembly with all the executive, legislative, and judicial power within the colony. Over time the colony's population grew, with a corresponding increase in the number of disputes for which adjudication was sought. The General Assembly responded by creating more lower courts, including county courts and superior courts, to try complaints. Eventually, the General Assembly came to be a "dernier court," or court of last appeal. See Day, supra, xi-xix.

In 1784 two events of significance to our judicial history occurred. First, the General Assembly, recognizing the principle of separation of governmental powers, enacted a law barring state or federal legislators from simultaneously holding positions as Superior Court judges. 5 Records of the State of Conn., May Sess., 1784, 323–24. By the same enactment the General Assembly created the Supreme Court of Errors. Id., 324. That court consisted of the lieutenant governor

and four council members and was the court of last resort in all matters of law and equity brought by writ of error from a judgment of the Superior Court. Id.

In 1806 the General Assembly acted to insulate further the judiciary from the political arena. An act passed at that time mandated that only judges of the Superior Court would thenceforth serve on the Supreme Court of Errors. Statutes, 1808, p. 218, c.14. That court retained jurisdiction over all writs of error taken from the rulings of inferior courts. Id.

Although the General Assembly gradually had bestowed some autonomy on the judiciary, it retained much of its ultimate jurisdiction over judicial matters. The General Assembly had sole jurisdiction to grant relief in equity where the amount in controversy exceeded $5335; Statutes, 1808, p. 550; and had unbridled authority to grant pardons, suspensions, or reprieves from judgments in criminal cases. Trumbull, Historical Notes on the Constitutions of Connecticut, pp. 41–42 (1901). In 1815 the General Assembly exercised this supervisory authority in the case of Peter Lung. Lung had been convicted of murder by the Superior Court of Middletown. Id., 43; see *Lung's Case,* 1 Conn. 428 (1815). The General Assembly, on petition for relief by the defendant, set aside the judgment of conviction on the grounds that the court had been illegally convened and that the order summoning the grand jury had been improperly issued. Trumbull, supra, p. 43; *Lung's Case,* supra. Chief Judge Swift, who had presided at Lung's trial, spoke out publicly against the General Assembly's action: " 'The government of the State, like most others, is divided into three branches, the executive, the legislative, and the judiciary. These are co-ordinate and independent of each other, and the powers of one should never be exercised by the other. . . . It ought to be holden as a fundamental axiom, that *the Legislature should never*

*encroach on the jurisdiction of the Judiciary,* nor assume the province of interfering in private rights, nor of overhaling the decisions of courts of law.' " (Emphasis in original.) Trumbull, supra, p. 43; see also O'Sullivan, "Biographies of Connecticut Judges: Zephaniah Swift," 19 Conn. B.J. 181 (1945).

During this time many Connecticut citizens felt that the state had no constitution. They believed that once the colonies declared independence in 1776 the charter of 1662 was abrogated and that, therefore, a state constitution was needed. See Trumbull, supra, pp. 15–47. The General Assembly's decision to overturn Lung's conviction apparently spurred the movement for a constitutional convention. See *State* v. *Clemente,* 166 Conn. 501, 513, 353 A.2d 723 (1974); *Styles* v. *Tyler,* 64 Conn. 432, 448–49, 30 A. 165 (1894).[12] In 1816 the newly elected General Assembly called a constitutional convention, which resulted in the formation of the constitution of 1818.

The constitution of 1818 unequivocally established the judiciary as an independent and autonomous branch of state government, on equal footing with the executive and legislative branches. As set forth above, the constitution vested the courts with the judicial power; Conn. Const., art. V; but specifically reserved the power of impeachment and removal of executive and judicial officers to the General Assembly. The records of the constitutional convention of 1818 do not explain the framers' reasons for doing so. A review of the impeachment and removal power's history and of the

---

[12] We note that at least one commentator disputes the notion that *Lung's Case,* 1 Conn. 428 (1815), was a moving force behind the creation of the constitution. Professor Richard S. Kay argues that the major force behind the convening of the constitutional convention "was the growth of the Jeffersonian party and its desire to reform the electoral process and to disestablish the Congregational Church." Kay, "The Rule-Making Authority and Separation of Powers in Connecticut," 8 Conn. L. Rev. 1, 6 n.27 (1975).

words of the framers of the United States constitution, however, demonstrates why this adjudicative power was vested with the legislature rather than the courts.

Although the exact origins of the impeachment and removal process are somewhat uncertain,[13] its function in Anglo-American government is well settled. In our republican system of government the electorate may remove unpopular elected officials from office by voting another candidate to that office at the next scheduled election. In order to prevent such officials from abusing their authority, however, the constitutions of the individual states and the federal constitution specifically provide for removal from office by legislative action. This impeachment process was borrowed largely from the English common law, where it was used to curb the power of the crown. Berger, Impeachment: The Constitutional Problems, pp. 1–14 (1973); 1 Foster, Commentaries on the Constitution of the United States, pp. 506–508 (1895); Williams, "The Historical and Constitutional Bases for the Senate's Power to Use Masters or Committees to Receive Evidence in Impeachment Trials," 50 N.Y.U. L. Rev. 512, 519–20 (1975).

During the seventeenth century, Parliament, fearful of what it perceived as absolutist tendencies on the part of King James I and King Charles I, began to use

---

[13] Scholars have traced the roots of impeachment to several different sources. Professor Raoul Berger identifies the House of Commons' prosecution of officers of the Crown in the late fourteenth century as the first acts of impeachment. Berger, Impeachment: The Constitutional Problems, p. 1 (1973). In his treatise on the constitution Professor Roger Foster wrote that impeachment grew out of the citizen trials used by the Athenian and Roman civilizations. 1 Foster, Commentaries on the Constitution of the United States, p. 506 (1895). Yet another commentator asserts that our concept of impeachment developed out of the French enlightenment and "reflects conceptions of Roman law relating to infamy, though modified by qualities unique to the late 18th century American social structure." Franklin, "Romanist Infamy and the American Constitutional Conception of Impeachment," 23 Buffalo L. Rev. 313 (1974).

its powers of impeachment against ministers chosen by the crown. The system chosen by Parliament to remove corrupt or oppressive ministers involved separate functions for each of its two houses. The House of Commons was charged with investigating any alleged misconduct or misprision. 2 Blackstone, Commentaries on the Laws of England, Book 4 pp. 213–14 (Chitty 1842). If the Commons decided that trial was warranted, it was to bring the charge before the House of Lords. "[T]he House of Lords was 'essentially a court for great men and great causes.' 1 Holdsworth 380 (3d Ed. 1922)." Berger, supra, 1 n.4. To analogize this system with the usual criminal prosecution, the House of Commons acted first as a grand jury and then as the prosecuting authority; the House of Lords sat as a court of law and as trier of facts. Berger, supra, p. 54; Williams, supra, p. 525.

Parliament's struggle to curb the powers of the crown and its ministers was not lost on the framers of the United States constitution. The colonists, too, had felt oppressed by governors and judges appointed by the crown. Berger, supra, p. 5. In establishing our government they remained fearful that a strong executive might move toward monarchism by usurping the powers that the people had reserved to themselves or vested with the legislature, the branch most immediately responsive to their wishes. The framers thus incorporated the impeachment and removal power into the United States constitution, adopting a system similar to that used by Parliament.

Article II, § 4, of the United States constitution provides: "The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors." The United States House of Representatives, like the House of Commons in Parliament, has the sole power

to bring articles of impeachment against such officers; U.S. Const., art. I, § 2; and the United States Senate, like the House of Lords, has the sole power to try all such impeachments. U.S. Const., art. I, § 3. On conviction the Senate may remove the convicted person from office and disqualify him or her from holding public office thereafter. U.S. Const., art. I, § 3; see *Kilbourn* v. *Thompson*, 103 U.S. 168, 190, 26 L. Ed. 377 (1881).

When the states of the union adopted their own constitutions most followed both the substance and the procedures adopted by the founding fathers in the federal constitution. Thus, the Connecticut constitution's impeachment and removal provisions, which differ only slightly from their federal counterparts,[14] may be understood in light of those federal provisions and the intent of the founding fathers in adopting them.

The evolution of impeachment and removal indicates that although the process is obviously adjudicative, and the sanctions imposed inescapably penal, it is not a purely judicial function. In the Federalist papers Alexander Hamilton identified the true nature of impeachment and removal: "A well-constituted Court for the trial of impeachments is an object not more to be desired, than difficult to be obtained in a Government wholly elective. The subjects of its jurisdiction are those offences which proceed from the misconduct of public men, or, in other words, from the abuse or violation of some public trust. They are of a nature which may with peculiar propriety be denominated *political,* as they relate chiefly to injuries done immedi-

---

[14] The primary difference between the United States constitution and the Connecticut constitution as regards impeachment and removal is that the federal provision authorizes impeachment for "Treason, Bribery, or other high Crimes and Misdemeanors." U.S. Const., art. II, § 4. The Connecticut constitution does not expressly state the standards for impeachable offenses. See Conn. Const., art. IX.

ately to the society itself." (Emphasis in original.) Federalist, No. 65, reprinted in Dawson, The Federalist, pp. 453–54 (1864).

Other courts, in addressing challenges to impeachment proceedings, have also recognized the political nature of the power. In *Ritter* v. *United States,* 84 Ct. Cl. 293, 299 (1936), cert. denied, 300 U.S. 668, 57 S. Ct. 513, 81 L. Ed. 875 (1937), the court commented: "[I]n *People* v. *Hayes,* [82 Misc. 165, 169, 143 N.Y.S. 325 (Sup. Ct. Special Term 1913)] the New York court referring to impeachment proceedings said: 'This great power is political. History is replete with illustrations of its use and abuse.' While the Senate in one sense acts as a court on the trial of an impeachment, it is essentially a political body and in its actions is influenced by the views of its members on the public welfare." In another leading impeachment case the Texas Supreme Court contrasted the legislature's power to remove malefactors from office with the court's jurisdiction over general criminal matters. *Ferguson* v. *Maddox,* 114 Tex. 85, 263 S.W. 888 (1924). The court observed that "[t]he Constitution, in relation to impeachment, has in mind the protection of the people from official delinquencies or malfeasances. . . . The primary purpose of an impeachment is to protect the State, not to punish the offender." Id., 98.

This is the background of the impeachment and removal power. We must now decide whether the Superior Court, under its constitutional grant of the judicial power, may intercede in this political process, which is textually committed solely to the General Assembly, at the behest of one who is the subject of an investigation by a committee of the House of Representatives purportedly acting under its impeachment authority.

This question is one of first impression. This court has never had occasion to interpret the impeachment

clause of the Connecticut constitution as it pertains to jurisdiction. Furthermore, the many cases of other courts cited by both parties are not directly on point. By and large those opinions address challenges to judgments of conviction brought *after* the legislature concluded its proceedings. The question of judicial intercession *during* such proceedings in circumstances similar to those presented here appears to be without precedent. Nevertheless, certain principles examined in those opinions are relevant to our inquiry.

In *Ferguson* v. *Maddox,* supra, the Texas Supreme Court noted that the judiciary may not look behind a senate's judgment of conviction to determine its wisdom. "It is unquestionably true that such judgment cannot be called in question in any tribunal whatsoever, except for lack of jurisdiction or excess of constitutional power." Id., 100.

The Pennsylvania Supreme Court has interpreted the impeachment clause of the Pennsylvania constitution similarly. Article VI, § 4, of the Pennsylvania constitution provides: "The House of Representatives shall have the sole power of impeachment." The court construed the jurisdictional import of that phrase as follows: "This plain language makes the power plenary within constitutional limits . . . . Therefore, the courts have no jurisdiction in impeachment proceedings, and no control over their conduct, so long as actions taken are within constitutional lines." *Dauphin County Grand Jury Investigation Proceedings (No. 2),* 332 Pa. 342, 345, 2 A.2d 802 (1938).

In *Smith* v. *Brantley,* 400 So. 2d 443 (Fla. 1981), the Florida Supreme Court was called upon to decide whether, for the legislature to impeach an officer, it was necessary that the subject of the impeachment be holding office at the time. In deciding that question the court recognized that the Florida constitution gives the

impeachment power wholly to the legislature and that the court may not interfere, provided that the legislature is validly acting within the scope of its impeachment authority. Id., 449. In *People* v. *Hayes,* supra, the New York court adopted a similar theme. It stated that a court "has no jurisdiction to inquire into the sufficiency of charges for which the governor may be impeached, nor, I take it, whether the proceedings looking to that end were properly conducted, unless at their foundation in their exercise, constitutional guarantees are broken down or limitations invaded." Id., 172–73.

Our analysis of our constitution's allotment of the judicial power and the impeachment power, aided by the opinions cited above, leads us to this conclusion: A court acting under the judicial power of article fifth of the constitution may exercise jurisdiction over a controversy arising out of impeachment proceedings only if the legislature's action is clearly outside the confines of its constitutional jurisdiction to impeach any executive or judicial officer; Conn. Const., art. IX, § 3; or egregious and otherwise irreparable violations of state or federal constitutional guarantees are being or have been committed by such proceedings.

We find neither of these circumstances to be present here. The committee's investigation is squarely within the legislature's jurisdiction under article ninth, § 3, and the plaintiff has not alleged the existence of such egregious and irreparable constitutional violations as would compel the Superior Court's intervention under its judicial power.

It is axiomatic that no branch of a government organized under a constitution may exercise any power that is not explicitly bestowed by that constitution or that is not essential to the exercise thereof. *Marbury* v. *Madison,* 5 U.S. (1 Cranch) 137, 176, 2 L. Ed. 60 (1803); *State* v. *Clemente,* 166 Conn. 501, 533, 353 A.2d

723 (1974); *Norwalk Street Ry. Co.'s Appeal,* 69 Conn. 576, 597, 37 A. 1080 (1897); *Opinion of the Judges of the Supreme Court as to Constitutionality of Soldiers' Voting Act,* 30 Conn. 591, 593–94 (1862). As to whether the legislature is acting clearly outside the confines of its constitutional jurisdiction to impeach any executive or judicial officer, the plaintiff challenges two aspects of the committee's investigation.

First, the plaintiff argues that a judge of probate is not a judicial officer within the ambit of article ninth, § 3, and that the General Assembly therefore does not have jurisdiction to impeach him.

This question is squarely resolved in *Adams* v. *Rubinow,* 157 Conn. 150, 251 A.2d 49 (1968). There, we specifically noted: "Section 3 of article ninth of the constitution of 1965 provides that '[t]he governor, and all other executive and judicial officers, shall be liable to impeachment.' This of course includes a judge of probate since he is clearly a judicial officer." (Brackets in original.) Id., 165. This is the most logical interpretation of the phrase "judicial officer." Under article ninth, § 3, a judge of probate may be impeached by the General Assembly.

Second, the plaintiff argues that the committee's investigation, coming as it does after a statutorily authorized investigation of his conduct by the Council on Probate Judicial Conduct; General Statutes § 45-11e; is therefore not within the purview of the impeachment power. We disagree.

Sections 45-11d through 45-11i of the General Statutes establish the Council on Probate Judicial Conduct and delineate its function. At all times pertinent to this case those sections provided, in relevant part, that the council, consisting of one judge of probate, one referee, one attorney, and two lay persons; General Statutes § 45-11d (a); was empowered to "investigate conduct

of judges of probate which may violate any law or canon of ethics applicable to judges of probate, or failure to perform properly the duties of the office, or the wilful failure to file a financial statement or the filing of a fraudulent financial statement required under section 45-11j." General Statutes § 45-11e (b). At the conclusion of its investigation and hearings, if any, the council must report its findings and recommend whether the subject judge "should be publicly reprimanded, publicly censured or exonerated of the allegations of the complaint." General Statutes § 45-11g (a). Furthermore, the council was authorized to recommend the institution of impeachment proceedings to the House of Representatives, should its findings so warrant. General Statutes § 45-11g (d).

The creation of the Council on Probate Judicial Conduct to conduct such investigations, however, does not deprive the House of Representatives of its constitutional authority to investigate independently any alleged misconduct by a probate judge. Sections 45-11d through 45-11i do not express any intention on the part of the General Assembly to divest itself of investigatory powers. Furthermore, we cannot so construe those sections because any such enactment would be void as an unconstitutional delegation of power. See *In re Chapman,* 166 U.S. 661, 671–72, 17 S. Ct. 677, 41 L. Ed. 1154 (1897).

The impeachment power granted the House of Representatives in article ninth, § 1, is stated in the broadest terms. By its nature the power to impeach is at once both investigatory and accusatory. It imports the inherent authority to conduct, within constitutional limitations, such investigations and hearings as may be necessary to resolve any question of impeachable conduct. Thus, House Resolution No. 26, which authorized the committee to investigate all "facts or circumstances relating to the conduct of James H. Kinsella,"

is a valid exercise of the impeachment power. See *Kilbourn* v. *Thompson,* 103 U.S. 168, 190, 26 L. Ed. 377 (1881); *McGinley* v. *Scott,* 401 Pa. 310, 320, 164 A.2d 424 (1960); Black, Handbook on Impeachment, p. 6 (1974).

We conclude therefore that the committee's investigation into the plaintiff's conduct is within its constitutional jurisdiction under the impeachment clause.

Because the committee is acting within its jurisdiction, the Superior Court may exercise jurisdiction in this impeachment controversy only if the plaintiff alleges that egregious and otherwise irreparable violations of constitutional guarantees are being or have been committed. *People* v. *Hayes,* 82 Misc. 165, 143 N.Y.S. 325 (Sup. Ct. Special Term 1913); *Dauphin County Grand Jury Investigation Proceedings (No. 2),* 332 Pa. 342, 2 A.2d 802 (1938); *Ferguson* v. *Maddox,* 114 Tex. 85, 100, 263 S.W. 888 (1924). This the plaintiff has failed to do.

The defendants take the extreme position that the General Assembly can take *any* action under article ninth—no matter how outrageous, abusive, or illegal—without even the possibility of judicial review. We note that some courts have held and several commentators have asserted that the exclusivity of the legislature's jurisdiction in such matters extends beyond the actual decision on the merits. See *Ritter* v. *United States,* 84 Ct. Cl. 293, 296–97 (1936); *State* v. *Chambers,* 96 Okla. 78, 220 P. 890 (1923); Black, supra, pp. 23–24; 1 Story, Commentaries on the Constitution of the United States (5th Ed. 1905) § 755; 3 Willoughby, The Constitutional Law of the United States (2d Ed. 1929) § 932; Wechsler, "Toward Neutral Principles of Constitutional Law," 73 Harv. L. Rev. 1, 8 (1959).

The exclusive power of impeachment, however, does not carry with it the authority to ignore individual rights with impunity. Our forebearers considered certain civil rights to be indispensable to the system of ordered liberty that they created. They enshrined the protections of such rights in our constitution to guarantee their existence against the political tides and fortunes of the day.

"The constitution of the state, framed by a convention elected for that purpose and adopted by the people, embodies their *supreme original will,* in respect to the organization and perpetuation of a state government; the division and distribution of its powers; the officers by whom those powers are to be exercised; and the limitations necessary to restrain the action of each and all for the preservation of the rights, liberties and privileges of all; and is therefore the supreme and paramount law, to which the legislative, as well as every other branch of the government, and every officer in the performance of his duties, must conform. Whatever that supreme original will prescribes, the General Assembly, and every officer or citizen to whom the mandate is addressed, must do; and whatever it prohibits, the General Assembly, and every officer and citizen, must refrain from doing; and if either attempt to do that which is prescribed, in any other manner than that prescribed, or to do in any manner that which is prohibited, their action is repugnant to that supreme and paramount law, and invalid." (Emphasis in original.) *Opinion of the Judges of the Supreme Court as to Constitutionality of Soldiers' Voting Act,* 30 Conn. 591, 593–94 (1862). "If the legislature shall attempt to encroach upon constitutional restrictions, it will become the solemn duty of the court to declare such an attempt illegal and the act void." *Pratt* v. *Allen,* 13 Conn. 119, 132 (1839).

Moreover, the power of impeachment under the state constitution must also be exercised in a manner consistent with the requirements of the federal constitution. U.S. Const., art. VI; *Reynolds* v. *Sims,* 377 U.S. 533, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964); *Neal* v. *Delaware,* 103 U.S. 370, 26 L. Ed. 567 (1880); *Ex Parte Siebold,* 100 U.S. 371, 25 L. Ed. 717 (1879); *M'Culloch* v. *Maryland,* 17 U.S. (4 Wheat.) 316, 4 L. Ed. 579 (1819).

The allegations contained in the plaintiff's complaint, however, do not warrant judicial intervention. As previously set forth, the court may intervene in or review an impeachment within the jurisdiction of the General Assembly only where some egregious and irreparable constitutional violation has occurred. Here the plaintiff claims that article ninth of the Connecticut constitution violates both the fourteenth amendment to the United States constitution and article first, §§ 8, 9, and 10 of the Connecticut constitution by its failure to establish standards for impeachable conduct and by its lack of due process guarantees. Even if we were to assume that such alleged violations would be sufficiently egregious, judicial intervention is not warranted because the plaintiff's action is premature. Any harm, as claimed by the plaintiff, to his liberty interest in his reputation or his occupational pursuit hinges on whether the House of Representatives presents articles of impeachment and whether the Senate convicts him. Absent some allegation that the committee investigation is currently violating his rights in an egregious way that cannot be repaired by the failure of the House of Representatives to present articles of impeachment or by an acquittal by the Senate, the committee's actions are within the legislature's exclusive jurisdiction.

Furthermore, even if the House of Representatives does present articles of impeachment against the plain-

tiff and he is then convicted by the Senate, we cannot presume that the trial will not be conducted in accordance with constitutional protections. Rather, we must presume that the members of the General Assembly will carry out their duties with scrupulous attention to the laws under which they serve.[15] "[W]e must and should presume that any officer of the state . . . will act lawfully, correctly, in good faith and in sincerity of purpose in the execution of his [or her] duties." *Rockefeller* v. *Hogue,* 244 Ark. 1029, 1037–38, 429 S.W.2d 85 (1968).

Article ninth, § 2, provides that the members of the Senate "on oath or affirmation" sit as a court of impeachment. Thus, in the first instance, it is for the Senate to determine the scope of any legitimate property or liberty interest of the plaintiff that might be jeopardized by an adverse judgment. See *Youngberg* v. *Romeo,* 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982); *Mills* v. *Rogers,* 457 U.S. 291, 102 S. Ct. 2442, 73 L. Ed. 2d 16 (1982); *Parham* v. *J.R.,* 442 U.S. 584, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979); *Greenholtz* v. *Nebraska Penal Inmates,* 442 U.S. 1, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979); *Bell* v. *Wolfish,* 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979); *Mathews* v. *Eldridge,* 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); *Board of Regents* v. *Roth,* 408 U.S. 564, 92 S.

---

[15] We note that thus far in the proceedings the plaintiff has been afforded certain safeguards. On July 25, 1983, the committee voted rules to govern its proceedings. Included among those rules are: prior notice to the plaintiff of all committee hearings, the right of the plaintiff and his counsel to attend all hearings, the right of the plaintiff or his counsel to object to the examination of any witnesses or the admissibility of testimony or evidence, the right of the plaintiff or his counsel to question witnesses, the right of the plaintiff to be provided with copies of documentary evidence, the right of the plaintiff's counsel to submit requests and precise summaries of any additional evidence that he wishes to put before the committee, and the right of the plaintiff to be furnished a copy of the Final Statement of Information submitted by the committee's special counsel, which shall contain the committee's findings and conclusions.

Ct. 2701, 33 L. Ed. 2d 548 (1972). After making that determination the Senate must then construe both the United States constitution and the Connecticut constitution to decide the procedural protections that must be afforded to protect those interests from unlawful infringement. In so doing it must balance the accused's property or liberty interest with the state's legitimate interest in maintaining an effective means of removing public officials from office where their conduct so warrants. "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews* v. *Eldridge, supra,* 335.

Similarly, with respect to the question of what conduct constitutes an impeachable offense, it is for the Senate to determine and define the ambit of article ninth, § 3, with regard to charges brought before it. We trust that in making this interpretation the Senate will be guided by the historical antecedents of the impeachment and removal process as well as interpretations of similar constitutional provisions that have been made by other courts and by legal scholars. *Ferguson* v. *Maddox,* 114 Tex. 85, 263 S.W. 888 (1924); *Sarisohn* v. *Appellate Division,* 265 F. Sup. 455 (E.D.N.Y. 1967); see generally 1 Story, supra, pp. 572–81. The Senate should also be aided in its inquiry by reference to the Connecticut Code of Probate Judicial Conduct. See *In re Nowell,* 293 N.C. 235, 243, 237 S.E.2d 246 (1977).

The harm alleged by the plaintiff is at best speculative. It will occur only if he is impeached and convicted of any charges and then only if the Senate had failed to define properly the scope of conduct that the constitution warrants as impeachable or had failed to provide procedures that ensure a fair determination of that question commensurate with the constitutionally protected interests at stake. This is not the sort of egregious and otherwise irreparable deprivation of constitutional protections that would justify court intervention in the orderly process of the General Assembly.

Because the committee's investigation is within the scope of the House of Representatives' power to impeach executive and judicial officers and because the plaintiff has failed to allege that the investigation is causing egregious and irreparable harm to his constitutional rights the General Assembly has exclusive jurisdiction over this controversy.

The answer to question number 1 is: Yes, the legislature has exclusive jurisdiction over this case at this time so as to warrant dismissal of the plaintiff's complaint by the trial court.

The defendants' appeal is dismissed as moot.

No costs will be taxed to any party.

In this opinion the other judges concurred.