HOUSING AUTHORITY OF THE CITY OF NEW HAVEN *v.* JOSEPH PERARO, COMMISSIONER OF THE DEPARTMENT OF LABOR, ET AL.

SUPERIOR COURT  JUDICIAL DISTRICT OF  FILE NO. 227021
NEW HAVEN

Memorandum filed January 18, 1985

*Eugene N. Sosnoff,* for the plaintiff.

*J. William Gagne,* for the defendant Dominick Lucenti et al.

*Joseph I. Lieberman,* attorney general, and *Richard T. Sponzo,* assistant attorney general, for the named defendant et al.

S. FREEDMAN, J. The plaintiff seeks an extraordinary remedy. It asks the court to invoke its equitable powers (a) to enjoin and remove the entire state board of mediation and arbitration as the arbitrator under a collective bargaining agreement with the defendant union, and (b) to substitute a new panel in its place. The parties presented this case on the basis of the plaintiff's amended complaint. The court will decide it as it has been presented.

The plaintiff's case relies upon a series of events from which it asks the court to draw a number of inferences which it argues will lead to the ultimate conclusion that the board, the union and a union official, Dominick Lucenti, illegally entered into a secret ex parte conspiracy, and that they unlawfully attempted to advance the interests of the union over those of the housing authority through partiality, preference, bias, unfair dealing and collusion. The authority sets forth a number of claims, among which are the violation of its rights

under the Connecticut constitution, the improper use of ex parte communications, an attempt to overturn and circumvent a "plumbing" arbitration decision, the improper influencing of the arbitration process, the board's unlawful adoption of an improper "quota" scheduling system, the board's failure to abide by its regulations, and the board's failure to adopt necessary regulations.

The court finds that the board responded to a budget shortfall by instituting a form of quota system with the units it services. Since it was accumulating a large backlog of filed grievances and was unable to hear many of them, the board wanted to hear the cases it felt were most significant, on a basis fairly proportional to the number of cases the various unions had with it. It felt this was a fair way to give all groups which utilized its services an opportunity to be heard. The board developed the practice of having its staff—in particular, the board secretary and her assistant—call the various unions (which were far fewer in number than their employer counterparts, and which were usually the source of the filed grievances) to determine which grievances were the more important ones that they wanted heard. In this way it tried to maximize its ability to arbitrate effectively, on a limited budget, the more important grievances. It also gave preference to certain priority grievances over and above the grievances subject to quotas.

Among the grievances filed by the union against the authority were many concerning whether maintenance personnel were entitled to a higher rate of pay for the performance of what they allege are plumbing duties. This issue was dealt with adversely to the union by an arbitration panel chaired by Howard Sacks. A motion by the union to vacate that decision was dismissed by the Superior Court. Thereafter, the union continued to assert plumbing grievances.

On August 3, 1978, the housing authority and the union entered into a collective bargaining agreement which was scheduled to expire September 30, 1980. It continues in effect under its terms because the parties failed to agree upon a new contract. Under § 7-473 of the General Statutes the parties entered factfinding, but the factfinder's recommendations have been rejected. The factfinder did not accept union proposals regarding the payment of higher wages for work in higher classifications. (Most of those claims stem from plumbing jobs.)

Subsequently, the board staff scheduled plumbing grievances at the request of Lucenti of the union, over the objections of Edmund Winterbottom, general counsel of the housing authority for April 3, 1984. Winterbottom claimed that recent grievances were being heard before older grievances and demanded that they be heard chronologically. He feared that the board was allowing Lucenti to control its docket. Winterbottom also informed the board scheduler that an important witness would be hospitalized until May and asked for a postponement. He became upset when he heard that the board had called Lucenti about the scheduling. Subsequently, Winterbottom became angry over what he considered unfair treatment, and relations between the plaintiff and the board staff deteriorated, became hostile and led to this litigation.

There are no written regulations covering scheduling of arbitral grievances which set forth the use of quotas or any other scheduling techniques.

## I

This court does not share the plaintiff's view of the evidence. It cannot draw the inferences and conclusions which the plaintiff urges. "In law, collusion is a species of fraud." *Gaer Bros., Inc.* v. *Mott,* 144 Conn. 303, 309, 130 A.2d 804 (1957). Since conspiracy and collu-

sion are concerned, the union's claim is one of fraudulent activity. To the extent that fraud is alleged it must be proved by clear and convincing evidence. But the plaintiff's evidence regarding collusion has not met the burden of proof required by the fair preponderance of the evidence standard. The court does not find the bias and prejudice the plaintiff seeks to establish. The court does not find that the board turned scheduling control over to the union and further tried to conceal what it knew to be an unsavory practice. Nor does the court find that the board placed itself in bondage to the union as the plaintiff argues. The plaintiff alleges a conspiracy. The court finds none.

The court notes that with the exception of the chairman, the plaintiff did not attempt to prove that any other particular board arbitrators are biased. There is only an amorphous claim made that somehow the *entire* panel of available arbitrators appointed by the governor has in some way been compromised by the union and is therefore biased and prejudiced against the plaintiff. The specifics of this alleged process are not revealed.

The court finds that the board attempted to respond to what it saw as a fiscal crisis, and that it tried to take measures it felt would fairly treat those who came before it, by hearing what it considered priority cases and the more important grievances. In so doing, it kept in contact each month with the unions on its list in an attempt to prioritize cases from the grievant's standpoint. Final control of the docket, however, was kept with the board which retained the right to disagree with any party and to schedule as it saw fit. Usually, the unions were able to have their way regarding scheduling, but this was a function of the system the board put into place and not because of any secret agreement or conspiracy between the board and the defendant union.

## II

For an injunction to issue (1) there must be an irreparable injury, (2) there must be no adequate remedy at law, and (3) the court must balance the equities. The issuance of injunctive relief and its scope and quantum rests in the sound discretion of the trier and "it may be inequitable to grant an injunction which would cause damage to the defendant greatly disproportionate to the injury of which the plaintiff complains." *DeCecco* v. *Beach,* 174 Conn. 29, 35, 381 A.2d 543 (1977).

The court finds that the plaintiff failed to sustain its burden of proving an irreparable injury. When an injunction is sought it is the time of trial which is controlling. *Jones* v. *Foote,* 165 Conn. 516, 521, 338 A.2d 467 (1973). There is no evidence that any grievances filed with the board concerning the plaintiff are presently assigned for hearing. There is no evidence that any other controversies have been scheduled by the board. The plaintiff is clearly not faced with any imminent danger. Even if there were grievances scheduled for hearing, it is entirely possible that the plaintiff would win. Many of the grievances filed by the union concern plumbers' pay, a subject which has *already* been decided in the plaintiff's favor by a board panel. Since there is evidence from which the court concludes that the plaintiff has, in fact, won before this board, it is not possible to conclude that the plaintiff will not win again. That is pure speculation. It is not proof of irreparable harm. Also, since no specific cases have been assigned, no specific arbitrators have been designated. It is even possible that arbitrators who have not yet even been appointed by the governor may eventually sit on the plaintiff's cases. This emphasizes the weakness of the plaintiff's claims. The plaintiff promised clear and convincing proof. What the plaintiff did prove was speculation, supposition, fears and appre-

hensions. Its case is not supported by the evidence in this court's view of the credibility of the testimony and the inferences it can draw. In the absence of a hearing, the question of irreparable injury is premature.

### III

It seems clear that the plaintiff also has available an adequate remedy at law, as well as far less intrusive equitable remedies. The provisions of § 52-418 of the General Statutes were designed to remedy complaints such as those alleged here. They allow the court to vacate an arbitration award "if it finds any of the following defects: (1) If the award has been procured by corruption, fraud or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made." General Statutes § 52-418 (a).

Section 52-418 is applicable to the board of mediation and arbitration. See *Danbury Rubber Co.* v. *Local 402*, 145 Conn. 53, 58, 138 A.2d 783 (1958), construing General Statutes § 8161, a predecessor to § 52-418. A close reading of § 52-418 makes it obvious that all of the complaints voiced by the plaintiff are cognizable by the Superior Court within the parameters of this statute and are capable of remediation by that court. Further, the plaintiff's own brief cites a number of cases which suggest that there are other equitable remedies available which trespass far less on the governmental sector. If a particular arbitrator on a panel is partial and biased, the court may remove the offend-

ing arbitrator. *Gaer Bros., Inc.* v. *Mott,* supra. This would not cause the upset to the processes of government that the unusual relief sought in this case would unleash. In this area of court discretion, that is surely a preferable course. It has long been the practice that " '[c]ourts will act with extreme caution where the granting of injunctive relief will result in embarrassment to the operations of government.' " *Heppenstall Co.* v. *Berkshire Chemical Co.,* 130 Conn. 485, 490, 35 A.2d 845 (1944). In the recent case of *Sentner* v. *Board of Trustees,* 184 Conn. 339, 344–45, 439 A.2d 1033 (1981), the Supreme Court expressed its preference for the declaratory judgment as a proper and adaptable vehicle for relief in matters of government operations. It further warned courts to avoid undue interference with governmental functions by scrupulously weighing the equities and by tailoring injunctive relief. Indeed, it suggested that courts may suspend the effective date of an injunction to afford the state an opportunity to minimize disruption to government and to comply voluntarily. The message is clear. The relief sought here seeks radical surgery upon an agency of state government. At best, only minor surgery would be warranted. Curiously, however, the plaintiff does not seek any such relief in its complaint.

The plaintiff did not seek to enjoin the board's scheduling policies of which it complains. Nor did it seek to force the board to produce regulations it claims are missing under General Statutes § 4-167, a section of the Uniform Administrative Procedure Act. Nor did it attempt to prevent the so-called secret, ex parte communications which it contends have led to a conspiracy against it. Even if it is assumed that the plaintiff met its burden of proof, properly fashioned, equitable relief in these areas could be an entirely adequate remedy. Again, although it alleged a violation of its contract with the union, it did not sue for breach of contract or

seek to enforce the contract. Further, it did not take its claim of bias and prejudice to the appointing authority for invocation of the removal process "for cause or for the good of the service . . . after notice and public hearing upon charges preferred" under the provisions of § 31-91, of the General Statutes. That statute also provides for an appeal to the Superior Court. The defendant union also points out that the allegations of the complaint are prohibited practices under General Statutes § 7-470 (b) (2) and (3) and that broad remedial powers exist to prevent such practices under the provisions of General Statutes § 7-471 (4), if such practices are found to exist. The union advances the theory as a failure to exhaust administrative remedies, which it may be, but the statutes serve to point out further, alternative legal remedies at the disposal of the plaintiff.

This court does not believe it is authorized by law to grant the relief requested by replacing this statutory board with a new arbitration panel. In the absence of a statutory authority, that is exceptional relief which would amount to judicial lawmaking.

## IV

The cases the plaintiff relies upon for this extraordinary remedy are inapposite to the facts of this case. In particular, the plaintiff continually stressed *Gaer Bros., Inc.* v. *Mott,* supra, 309, which allows the disqualification of a sitting arbitrator during a hearing "when . . . one of the parties can prove partiality and collusion in the arbitration proceedings." In the present case, there are no proceedings, no sitting arbitrator, and in the court's view of the evidence, no partiality and collusion. The necessary ingredients for a *Gaer Bros.* disqualification are not in evidence. Further, in the quarter century since *Gaer Bros.* was announced in 1957, the thrust of Connecticut's case and statute

law on arbitration proceedings has advanced to the point where the state's public policy prescribes a minimum of judicial interference in arbitral proceedings. It would require a showing of a need for judicial interference which the plaintiff has failed to establish.

*Holodnak* v. *Avco Corporation,* 381 F. Sup. 191 (D. Conn. 1974), similarly concerned a clear showing of bias on the part of a sitting arbitrator. It is not on point. *Yates* v. *Yellow Freight System,* 501 F. Sup. 101 (S.D. Ohio 1980), concerned the vacating of an arbitration award, as did *Commonwealth Coatings Corporation* v. *Continental Casualty Co.,* 393 U.S. 145, 89 S. Ct. 337, 21 L. Ed. 2d 301 (1968). *Hines* v. *Anchor Motor Freight,* 424 U.S. 554, 96 S. Ct. 1048, 47 L. Ed. 2d 231 (1976), has no application here since the court cannot find that the union undermined the integrity of the arbitral process. Employer-union relationships are not always pleasant and are often hostile. But aggressiveness and hostility are not proof of collusion. On this record, none of the cases the plaintiff cites provides a legal basis for the relief it requests. There is no attempt here to disqualify a sitting arbitrator or to set aside a decision. Instead, the plaintiff asks the court to enjoin the statutory function of an entire state board, prior to any hearing, and, without citing any authority, requests the court to substitute a new panel.

The board was the choice of the parties. They contracted for it through collective bargaining. The court cannot rewrite the terms of the parties' contract. That was their privilege.

V

Since the court does not find the plaintiff's allegations proved, its constitutional arguments must also fail. This court finds no exclusive public emoluments or privileges granted, as alleged, under article first, § 1, of the Connecticut constitution. The court also finds

no violation of the state's equal protection clause in article first, § 20. The plaintiff appears to be receiving the same treatment as others similarly situated. Any differences between it and others in somewhat different circumstances have been rationally explained. Nor does the inclusion of article first, § 10, avail the plaintiff. It has not been denied the privilege to apply to a court. If anything, it appears to be fighting the wrong war at the wrong time over the wrong issue. Article first, § 8, is inapposite to this case since it deals with the criminal law. Moreover, there was a failure of proof of any causal connection between the alleged violations and the wrong complained of. Finally, in such doubtful cases it is often wise to defer such constitutional decisions to the appellate courts. *Caldor, Inc.* v. *Thornton,* 191 Conn. 336, 344, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 557 (1985).

## VI

The plaintiff also complains, in effect, that its rights are violated by the union's refusal to accept the arbitration award of Howard Sacks as binding on all other "plumbing" grievances and by the union's attempt to circumvent that award. It notes that the Superior Court dismissed an appeal by the union and claims that that decision is res judicata. That award was based upon an unrestricted submission. In such cases the court cannot inquire into the arbitrator's decision on the facts or the law; *Bic Pen Corporation* v. *Local No. 134,* 183 Conn. 579, 584, 440 A.2d 774 (1981); even if the decision is regarded as unwise or wrong on the merits. *Local 453* v. *Otis Elevator Co.,* 314 F.2d 25, 28 (2d Cir. 1963). The decision is not binding precedent and there is no reason why the union cannot file subsequent plumbing grievances. Moreover, there is testimony that the facts in the later grievances differ from those in the Sacks arbitration. To assume, as the plaintiff does,

that this is evidence of improper or underhanded behavior on the union's part again illustrates the weakness of the plaintiff's case.

## VII

The board employees who handle the scheduling of grievances are employees of the department of labor, of which the board is a constituent part. Even if the actions of those employees were in any way unwise or improper, the plaintiff has failed to establish how those actions can fatally infect the arbitrators who may or may not have any knowledge of the scheduling processes. (It is not established that all sitting arbitrators know who does the actual scheduling.) As indicated earlier, newly appointed (or yet to be appointed) arbitrators could sit on grievances affecting the plaintiff. The plaintiff first argues the impropriety and unlawfulness of these employees' activities and then makes a quantum leap to the conclusion that this causes the arbitrators, chosen by the governor, to be unfair and prejudiced. In this, they have not met their burden of proof. The court cannot draw that inference. Even if the court found the actions in question to be wrongful, the credible evidence does not establish that they amount to collusion or a conspiracy. Effectively, the plaintiff has attempted a boot strap argument in which, at some point, it must assume its own conclusion and work backwards. The trial and the plaintiff's argument were rife with speculation.

The Supreme Court recently reminded us that we " 'must and should presume that any officer of the state . . . will act lawfully, correctly, in good faith and in sincerity of purpose in the execution of his [or her] duties.' " *Kinsella* v. *Jaeckle,* 192 Conn. 704, 729, 475 A.2d 243 (1984). Essentially, the plaintiff asks the court to assume just the opposite. It cannot.

## VIII

The plaintiff complains bitterly of ex parte communications between the board and the union, contending that such communications are evidence of collusive behavior. Indeed, both sides have accused the other of this conduct. It appears that most of what the plaintiff decries was a general pattern of scheduling behavior which existed before the formation of any arbitration panels. Since board regulation § 31-91-49 of the regulations of Connecticut state agencies refers to communications with "panel" members, it is obvious that ex parte scheduling conversations do not violate this regulation as alleged, since they occur before a panel is selected.

While there was evidence of an ex parte communication by the union's attorney, with John Norman, the factfinder, that does not in the court's opinion, based upon the evidence before it, lead to the extreme conclusion the plaintiff urges. Regulation § 31-91-49 is a part of article II of the board's regulations and is concerned only with grievance arbitration, not factfinding.

Further, there is no credible evidence that any communication is causally connected to any specific bias or prejudice.

The plaintiff also claims that the board violated regulation § 31-91-51 entitled "Request for expedited arbitration." While that may have been so, there is presently no evidence that any expedited arbitration proceeding is scheduled, and any past violation would not rise to the level of justifying the relief sought. This does not mean that the court approves of ex parte communications. It does not. At best, they are unnecessarily questionable, and, at worst, they can reach the unethical. But there are more appropriate ways to stop such communications, ways which the parties have

ignored. And if the board had the desire, it could seek to add a penalty provision to its regulations, or even ask the legislature for assistance.

## IX

The plaintiff also alleges that the April 3, 1984 scheduling of grievances was improper since the board secretary refused a postponement despite knowledge of the fact that a critical witness would be in the hospital and unavailable. First, the plaintiff had a right to seek a postponement from the arbitration panel, which might have granted it after hearing the parties. Second, the question of arbitrability was raised and this could have been handled on that date, making a postponement unnecessary. Third, General Statutes § 52-418 addresses that very question and allows the court to vacate an arbitration decision if the arbitrators improperly refuse a postponement.

## X

The court believes that when the board decided to institute a "quota" type system, it should have first adopted scheduling regulations pursuant to the provisions of § 4-167 of the General Statutes. In § 4-166, "regulation" is defined as a statement of general applicability that describes procedure or practice requirements of any agency. The term does not include statements concerning an agency's management which do not affect private rights or procedures available to the public. The quota system the board adopted does, however, appear to affect such private rights or procedures. It sets up a system of priorities, allots cases to unions on a percentage basis, and in fact, depending upon the criteria the board utilizes, its operation means that some cases will be heard, and some cases will not. The impact upon private rights is too great to avoid the need for adopting a regulation. But granting this,

there is no evidence of any causal connection between the lack of a regulation and the unproved allegation of prejudice.

Oddly, there was no request for relief on this issue. While the court has general equitable powers, the defendant board is entitled to notice in advance of the remedies it must defend against. Otherwise, the board cannot receive a fair hearing and properly defend itself. Therefore, in the absence of a claim for relief, the court will decline to act on this issue.

## XI

Aside from all else, however, the court does not find that it has a case or controversy—and therefore a justiciable issue—before it. There is no evidence that any of the grievances filed with the board is now scheduled for a hearing. There are no panels presently in existence regarding these grievances. It is clear that there are now so many grievances filed with the board that it cannot hear them all. There is no evidence that any specific grievance between the parties will ever be heard. Until a case is actually scheduled for hearing there can be no controversy. Any decision rendered here would, in effect, be hypothetical. Under the circumstances, the court lacks jurisdiction in the absence of an actual controversy between the parties.

There is evidence that a collective bargaining agreement between the plaintiff and the union has expired, that they have been unable to reach agreement on a new contract, and that factfinding was carried out and rejected. The plaintiff alleges that proceedings as provided by state law are now in progress. Under General Statutes § 7-473c if the services of the board are not requested by one of the parties, another arbitration panel exclusive of the board must make the decision under binding arbitration. A review of the court's rather complete and voluminous notes and of a part

of the transcript reveals that the court received no credible evidence that the services of the board were requested regarding any such proceedings. Therefore, on this record, the court cannot determine that the board is involved in the collective bargaining agreement. Thus, there is no case or controversy before the court. See *State* v. *Nardini,* 187 Conn. 109, 112, 445 A.2d 304 (1982). Further, on this record there is doubt that the matter is capable of being adjudicated by judicial power. See *Baker* v. *Carr,* 369 U.S. 186, 198, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962); *State* v. *Nardini,* supra. The real heart of this case appears to be a fiscal crisis which presents, in reality, a political question for the legislative branch to solve.

In any event, the court must fashion its decision in the context of the plaintiff's claim. That claim has not been proved and cannot support the radical relief requested. What the plaintiff has proved is considerable hostility between the parties and a great many fears and apprehensions by the plaintiff that it cannot receive fair treatment. But this court will not grant injunctive relief which rewrites a contract and eliminates the statutory powers of the board as to these parties merely because of fears and apprehensions. Injunctions are exceptional remedies which should be utilized with great caution at all times. *Nicholson* v. *Connecticut Half-Way House, Inc.,* 153 Conn. 507, 511, 218 A.2d 383 (1966).

## XII

Accordingly, the issues on all counts are found for the defendants. The plaintiff's motion for a permanent injunction is denied. The temporary restraining order signed by Judge Zoarski is hereby dissolved.